**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

Nos. 13-3536, 14-1374, 14-1376, 14-1377

———————————

GENEVA COLLEGE; WAYNE HEPLER; THE SENECA
HARDWOOD LUMBER COMPANY, INC., a Pennsylvania
Corporation; WLH ENTERPRISES, a Pennsylvania Sole
Proprietorship of Wayne L. Hepler; CARRIE E. KOLESAR

v.

SECRETARY UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; SECRETARY
UNITED STATES DEPARTMENT OF LABOR;
SECRETARY UNITED STATES DEPARTMENT OF THE
TREASURY; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; UNITED STATES
DEPARTMENT OF LABOR; UNITED STATES
DEPARTMENT OF THE TREASURY,

Appellants in case no. 13-3536

GENEVA COLLEGE; WAYNE L. HEPLER, in his personal capacity and as owner and operator of the sole proprietorship WLH Enterprises; THE SENECA HARDWOOD LUMBER COMPANY, INC., a Pennsylvania Corporation; CARRIE E. KOLESAR

v.

SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES DEPARTMENT OF LABOR; SECRETARY UNITED STATES DEPARTMENT OF THE TREASURY; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF THE TREASURY,

Appellants in case no. 14-1374

MOST REVEREND LAWRENCE T. PERSICO, BISHOP OF THE ROMAN CATHOLIC DIOCESE OF ERIE, AS TRUSTEE OF THE ROMAN CATHOLIC DIOCESE OF ERIE, A CHARITABLE TRUST; THE ROMAN CATHOLIC DIOCESE OF ERIE; ST. MARTIN CENTER, INC., AN AFFILIATE NONPROFIT CORPORATION OF CATHOLIC CHARITIES OF THE DIOCESE OF ERIE; PRINCE OF PEACE CENTER, INC., AN AFFILIATE NONPROFIT CORPORATION OF CATHOLIC CHARITIES OF THE DIOCESE OF ERIE; ERIE CATHOLIC PREPARATORY SCHOOL, AN AFFILIATE NONPROFIT CORPORATION OF THE ROMAN CATHOLIC DIOCESE OF ERIE

v.

SECRETARY OF UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; SECRETARY OF
UNITED STATES DEPARTMENT OF LABOR;
SECRETARY OF UNITED STATES DEPARTMENT OF
THE TREASURY; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; UNITED STATES
DEPARTMENT OF LABOR; UNITED STATES
DEPARTMENT OF THE TREASURY,

Appellants in case no. 14-1376


MOST REVEREND DAVID A. ZUBIK, BISHOP OF THE
ROMAN CATHOLIC DIOCESE OF PITTSBURGH, as
Trustee of the Roman Catholic Diocese of Pittsburgh, a
Charitable Trust; THE ROMAN CATHOLIC DIOCESE OF
PITTSBURGH, as the Beneficial Owner of the Pittsburgh
series of The Catholic Benefits Trust; CATHOLIC
CHARITIES OF THE DIOCESE OF PITTSBURGH, INC.,
an affiliate nonprofit corporation of The Roman Catholic
Diocese of Pittsburgh

v.

SECRETARY OF UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; SECRETARY OF
UNITED STATES DEPARTMENT OF LABOR;
SECRETARY OF UNITED STATES DEPARTMENT OF
THE TREASURY; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; UNITED STATES

DEPARTMENT OF LABOR; UNITED STATES
DEPARTMENT OF THE TREASURY,

Appellants in case no. 14-1377

---

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court Nos.: 1-13-cv-00303; 2-12-cv-00207 and
2-13-cv-01459)
District Judges:  Honorable Joy Flowers Conti; Honorable
Arthur J. Schwab

---

Argued on November 19, 2014

Before:  McKEE, Chief Judge, RENDELL, SLOVITER,
Circuit Judges

(Opinion filed: February 11, 2015)

Stuart F. Delery, Esquire
David J. Hickton, Esquire
Beth S. Brinkmann, Esquire
Mark B. Stern, Esquire **(ARGUED)**
United States Department of Justice
Civil Division
Room 7531
950 Pennsylvania Avenue, N.W.
Washington, DC   20530

Michael A. Comber, Esquire
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA    15219

Bradley P. Humphreys, Esquire
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Room 7130
Washington, DC    20530

Adam C. Jed, Esquire
United States Department of Justice
Civil Division
Appellate Section, Room 7240
950 Pennsylvania Avenue, N.W.
Washington, DC    20530

Alisa B. Klein, Esquire
United States Department of Justice
Civil Division
Appellate Section, Room 7325
950 Pennsylvania Avenue, N.W.
Washington, DC    20530

Patrick Nemeroff, Esquire
United States Department of Justice
Civil Division, Room 7217
950 Pennsylvania Avenue, N. W.
Washington, DC    20530

Eric R. Womack, Esquire
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N. W.
Room 7130
Washington, DC   20530

       Counsel for Appellants Secretary United States
Department of Health and Human Services; Secretary United
States Department of Labor; Secretary United States
Department Of Treasury; United States Department of Health
and Human Services; United States Department of Labor;
United States Department of the Treasury


Steven H. Aden, Esquire
Gregory S. Baylor, Esquire **(ARGUED)**
Matthew S. Bowman, Esquire
Alliance Defending Freedom
801 G Street, N.W.
Suite 509
Washington, DC 20001

Erik W. Stanley, Esquire
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ  85260

Kevin H. Theriot, Esquire
Alliance Defending Freedom
15192 Rosewood Street
Leawood, KS  66224

David A. Cortman, Esquire
Alliance Defending Freedom
1000 Hurricane Shoals, N.E.
Building D - Suite 1100
Lawrenceville, GA 30043

David J. Mongillo, Esquire
Bradley S. Tupi, Esquire
Tucker Arensberg
1500 One PPG Place
Pittsburgh, PA 15222

     Counsel for Appellees Geneva College; Seneca Hardwood Lumber Company, Inc.; Carrie E. Kolesar; Wayne Hepler

Paul M. Pohl, Esquire **(ARGUED)**
John D. Goetz, Esquire
Leon F. DeJulius, Jr., Esquire
Ira M. Karoll, Esquire
Alison M. Kilmartin, Esquire
Mary Pat Stahler, Esquire
Jones Day
500 Grant Street, Suite 4500
Pittsburgh, PA   15219

     Counsel for Appellees Most Reverend Lawrence T. Persico, Bishop Of The Roman Catholic Diocese of Erie, as Trustee of the Roman Catholic Diocese Of Erie, a Charitable Trust; The Roman Catholic Diocese of Erie; ST. Martin Center, Inc., an affiliate Nonprofit Corporation of Catholic Charities of the Diocese of Erie; Prince of Peace Center, Inc.,

7

an Affiliate Nonprofit Corporation Of Catholic Preparatory School, an Affiliate Nonprofit Corporation Of The Roman Catholic Diocese of Erie; Most Reverend David A. Zubik, Bishop of the Roman Catholic Diocese of Pittsburgh, as Trustee of the Roman Catholic Diocese of Pittsburgh, a Charitable Trust, Roman Catholic Diocese of Pittsburgh, Catholic Charities Diocese Of Pittsburgh

Deborah J. Dewart, Esquire
Liberty, Life and Law Foundation
620 East Sabiston Drive
Swansboro, NC   28584

        Counsel for Amicus Liberty, Life and Law
Foundation

Witold J. Walczak, Esquire
Sara J. Rose, Esquire
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA   15213

Brigitte Amiri, Esquire
Jennifer Lee, Esquire
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY   10004

Daniel Mach, Esquire
American Civil Liberties Union Foundation
915 15th Street, 6th Floor
Washington, DC   20005

Counsel for Amicus Julian Bond, The American Civil Liberties Union and the American Civil Liberties Union of Pennsylvania


Charles E. Davidow, Esquire
Andree J. Goldsmith, Esquire
Karin Dryhurst, Esquire
Paul, Weiss, Rifkind, Wharton & Garrison
2001 K Street, N.W., Suite 600
Washington, DC   20006

Marcia D. Greenberger, Esquire
Judith G. Waxman, Esquire
Emily J. Martin, Esquire
Gretchen Borchelt, Esquire
Leila Abolfazli, Esquire
National Women' Law Center
11 DuPont Circle, NW, Suite 800
Washington, DC   20036

Counsel for Amicus National Women's Law Center and Twenty Other National, State and Local Organizations


Ayesha N. Khan, Esquire
American United For Separation of Church and State
1301 K Street, NW, Suite 850, East Tower
Washington, DC   20005

Counsel for Amicus American United for Separation of Church and State

Sarah Somers, Esquire
Martha Jane Perkins, Esquire
Dipti Singh, Esquire
National Health Law Program
101 East Weaver Street, Suite G-7
Carrboro, NC   27510

Counsel for National Health Law Program, American Public Health Association, National Family Planning & Reproductive Health Association, National Women's Health Network, National Latina Institute For Reproductive Health, National Asian Pacific American Women's Forum, Asian Americans Advancing Justice, AAJC, Asian Americans Advancing Justice, Los Angeles, Asian & Pacific Islander American Health Forum, National Hispanic Medical Association, Forward Together, IPAS, Sexuality Information and Education Council of the U. S. (Siecus), HIV Law Project, and California Women's Law Center as Amici Curiae

Kimberlee Wood Colby, Esquire
Center for Law & Religious Freedom
Christian Legal Society
8001 Graddock Road, Suite 302
Springfield, VA   22151

The Association of Gospel Rescue Missions, Prison Fellowship Ministries, Association of Christian Schools International, National Association of   Evangelicals, Ethics & Religious Liberty Commission of the Southern Baptist Convention, American Bible Society, The Lutheran

10

Church – Missouri Synod, Institutional Religious Freedom Alliance, and Christian Legal Society in Support of Appellees and Urging Affirmance

O P I N I O N

**RENDELL**, Circuit Judge:

The appellees in these consolidated appeals challenge the preventive services requirements of the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4. Particularly, the appellees object to the ACA's requirement that contraceptive coverage be provided to their plan participants and beneficiaries. However, the nonprofit appellees are eligible for an accommodation to the contraceptive coverage requirement, whereby once they advise that they will not pay for the contraceptive services, coverage for those services will be independently provided by an insurance issuer or third-party administrator. The appellees urge that the accommodation violates RFRA because it forces them to "facilitate" or "trigger" the provision of insurance coverage for contraceptive services, which they oppose on religious grounds. The appellees affiliated with the Catholic Church also object on the basis that the application of the accommodation to Catholic nonprofit organizations has the impermissible effect of dividing the Catholic Church, because the Dioceses themselves are eligible for an actual exemption from the

11

contraceptive coverage requirement. The District Courts granted the appellees' motions for a preliminary injunction, and, in one of the cases, converted the preliminary injunction to a permanent injunction. Because we disagree with the District Courts and conclude that the accommodation places no substantial burden on the appellees, we will reverse.

## I. BACKGROUND

### A. Statutory and Regulatory Background

#### 1. The Affordable Care Act, the Preventive Services Coverage Requirement, and the Accommodation for Religious Nonprofit Organizations

In 2010, Congress passed the ACA, which requires group health plans and health insurance issuers offering health insurance coverage[1] to cover preventive care and screenings for women, without cost sharing (such as a copayment, coinsurance, or a deductible), as provided for in guidelines established by the Department of Health and

---

[1] Eligible organizations may be either "insured" or "self-insured." An employer has an "insured" plan if it contracts with an insurance company to bear the financial risk of paying its employees' health insurance claims. An employer has a "self-insured" plan if it bears the financial risk of paying its employees' claims. Many self-insured employers use third-party administrators to administer their plans and process claims. *See* Cong. Budget Office, Key Issues in Analyzing Major Health Insurance Proposals 6 (2008). The appellees here fall into both categories.

Human Services ("HHS"). 42 U.S.C. § 300gg-13(a)(4).[2] HHS requested assistance from the Institute of Medicine ("IOM"), a nonprofit arm of the National Academy of Sciences, to develop guidelines regarding which preventive services for women should be required. Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8726 (Feb. 15, 2012) (codified at 26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; and 45 C.F.R. pt. 147). The IOM issued a report recommending a list of preventive care services, including all contraceptive methods approved by the Food and Drug Administration ("FDA"). The regulatory guidelines accordingly included "[a]ll Food and Drug Administration . . . approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," as prescribed by a health care provider. 77 Fed. Reg. at 8725 (alteration in original). The relevant regulations require coverage of the contraceptive services recommended in the guidelines. *See* 26 C.F.R. § 54.9815-2713(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 45 C.F.R. § 147.130(a)(1)(iv).

---

[2] The ACA's preventive care requirements apply only to non-grandfathered group health plans and health insurance issuers offering non-grandfathered health insurance coverage. *See* 45 C.F.R. § 147.140 (exempting "grandfathered" plans— "coverage provided by a group health plan, or a group or individual health insurance issuer, in which an individual was enrolled as of March 23, 2010," the date on which the ACA was enacted "for as long as it maintains that status under the rules of this section").

The implementing regulations authorize an exemption from contraceptive coverage for the group health plan of a "religious employer." 45 C.F.R. § 147.131(a). The regulations define a religious employer as a nonprofit organization described in the Internal Revenue Code provision referring to churches, their integrated auxiliaries, and conventions or associations of churches, and the exclusively religious activities of any religious order. *Id.* (citing 26 U.S.C. § 6033(a)(3)(A)(i), (iii)).

After notice-and-comment rulemaking, the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services (the "Departments") published final regulations in July 2013 that provided relief for organizations that, while not "religious employers," nonetheless oppose coverage on account of their religious objections. These regulations include an "accommodation" for group health plans established or maintained by "eligible organizations" (and group health coverage provided in connection with such plans). *See* 26 C.F.R. § 54.9815-2713A(a), 29 C.F.R. § 2590-2713A(a), 45 C.F.R. § 147.131(b); Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39,870 (July 2, 2013) (codified at 26 C.F.R. pt. 54; 29 C.F.R. pts. 2510 & 2590; and 45 C.F.R. pts. 147 & 156). An "eligible organization" means a nonprofit organization that "holds itself out as a religious organization" and "opposes providing coverage for some or all of any contraceptive services required to be covered . . . on account of religious objections." 45 C.F.R. § 147.131(b). To invoke this accommodation, an employer must certify that it is such an organization. *Id.* § 147.131(b)(4). Here, there is no dispute that the nonprofit religious organization appellees are eligible organizations under these regulations.

To take advantage of the accommodation to the contraceptive coverage requirement, the eligible organization must complete the self-certification form, EBSA Form 700, issued by the Department of Labor's Employee Benefits Security Administration, indicating that it has a religious objection to providing coverage for the required contraceptive services. The eligible organization then is to provide a copy of the form to its insurance issuer or third-party administrator. 78 Fed. Reg. at 39,875.[3]

---

[3] After these suits had been filed, the Supreme Court granted an injunction pending appeal in *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014), and ordered that the eligible organization applicant need not use EBSA Form 700 to notify its insurance issuer or third-party administrator of its religious objection to the contraceptive coverage requirement; instead, if the organization notifies the government in writing of its objection, the government is enjoined from enforcing the contraceptive coverage requirement against the organization. *Id.* at 2807. In response, interim final regulations were issued in August 2014 allowing an eligible organization to opt out by notifying HHS directly, rather than notifying its insurance issuer or third-party administrator; the eligible organization also need not use EBSA Form 700. Coverage of Certain Preventive Services Under the Affordable Care Act, 79 Fed. Reg. 51,092 (Aug. 27, 2014) (codified at 26 C.F.R. pt. 54; 29 C.F.R. pts. 2510 & 2590; and 45 C.F.R. pt. 147); *see also* 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B), (c)(1)(ii); 45 C.F.R. § 147.131(c)(1)(ii). We conclude here that the accommodation, even when utilizing EBSA Form 700, poses no substantial burden. To the extent that the Supreme Court's order in *Wheaton* may be read to signal that the alternative

15

The submission of the form has no real effect on the plan participants and beneficiaries. They still have access to contraception, without cost sharing, through alternate mechanisms in the regulations.[4] Under these regulations, an eligible organization is not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it objects on religious grounds. 78 Fed. Reg. at 39,874. As a result, either the health insurance issuer or the third-party administrator is required by regulation to provide separate payments for contraceptive services for plan participants and beneficiaries. The ACA's prohibition on cost sharing for preventive services, including contraception, bars the insurance issuer or third-party administrator from imposing any premium or fee on the group health plan, or plan participants and beneficiaries. Furthermore, the accommodation prohibits the insurance issuer or third-party administrator from imposing such fees on the eligible organization. *See* 42 U.S.C.

notification procedure is less burdensome than using EBSA Form 700, we also conclude that the alternative compliance mechanism set forth in the August 2014 regulations poses no substantial burden.

[4] The Supreme Court has recognized that the accommodation ensures that employees of entities with religious objections have the same access to all FDA-approved contraceptives as employees of entities without religious objections to providing such coverage. "The effect of the HHS-created accommodation on the women employed . . . would be precisely zero. Under that accommodation, these women would still be entitled to all FDA-approved contraceptives without cost sharing." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014).

16

§ 300gg-13(a); 29 C.F.R. § 2590.715-2713A(b)(2), (c)(2)(ii); 45 C.F.R. § 147.131(c)(2)(ii). The insurance issuer or third-party administrator must "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the [eligible organization's] group health plan" and "segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services." 29 C.F.R. § 2590.715-2713A(c)(2)(i)(A), (ii); 45 C.F.R. § 147.131(c)(2)(i)(A), (ii). The third-party administrator may seek reimbursement for payments for contraceptive services from the federal government. 29 C.F.R. § 2590.715-2713A(b)(3).

Furthermore, the health insurance issuer or third-party administrator, *not* the eligible organization, provides notice to the plan participants and beneficiaries regarding contraceptive coverage "separate from" materials that are distributed in connection with the eligible organization's group health coverage, specifying that "the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services, and must provide contact information for questions and complaints." *See* 26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(d).[5] This is in accordance with the preventive services requirement of the ACA.

---

[5] As part of this separate notice regime, eligible organizations do not need to provide the names of their beneficiaries to their insurance issuers or third-party administrators, or otherwise coordinate notices with them. *See Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 254 (D.C. Cir. 2014) (agreeing that "[n]o regulation related to the

17

## 2. RFRA Challenge to the Accommodation

The appellees challenge the ACA's contraceptive coverage requirement as posing a substantial burden on their religious exercise, in violation of RFRA. RFRA places requirements on all federal statutes that impact a person's exercise of religion, even when that federal statute is a rule of general applicability. 42 U.S.C. § 2000bb-1(a).[6] Under RFRA, the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b).

---

accommodation imposes any such duty on Plaintiffs"); *see also* 29 C.F.R. § 2590.715-2713A(b)(4) ("A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor"); *id.* § 2590.715-2713A(c)(1)(i) ("When a copy of the self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage . . . . An issuer may not require any further documentation from the eligible organization regarding its status as such.").

[6] Because the issue was not raised before us, we assume that RFRA is constitutional as applied to federal laws and regulations. *But see City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) (holding that Congress did not have authority under the Fourteenth Amendment to impose RFRA on state or local laws).

Congress enacted RFRA in 1993 in response to the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). In *Smith*, the Supreme Court rejected the balancing test for evaluating claims under the Free Exercise Clause of the First Amendment set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), under which the Court asked whether the challenged law substantially burdened a religious practice and, if it did, whether that burden was justified by a compelling governmental interest. The *Smith* Court concluded that the continued application of the compelling-interest test would produce a constitutional right to ignore neutral laws of general applicability and would "open the prospect of constitutionally required religious exemptions from civil obligations of almost every conceivable kind," which the First Amendment does not require. 494 U.S. at 888-89. "The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'" *Id.* at 885 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 451 (1988)). Making an individual's obligation to obey a generally applicable law contingent upon the individual's religious beliefs, except where the state interest is compelling, permits that individual, "by virtue of his beliefs, 'to become a law unto himself,'" which "contradicts both constitutional tradition and common sense." *Id.* (quoting *Reynolds v. United States,* 98 U.S. 145, 167 (1878)).

19

Congress then passed RFRA to legislatively overrule the *Smith* standard for analyzing claims under the Free Exercise Clause of the First Amendment. RFRA's stated purposes are: (1) to restore the compelling-interest test as set forth in *Sherbert* and *Yoder* and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by the government. 42 U.S.C. § 2000bb(b). The Supreme Court has characterized RFRA as "adopt[ing] a statutory rule comparable to the constitutional rule rejected in *Smith*." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006).

## B. Factual Background and Procedural History[7]

We review here the following District Court opinions: two preliminary injunctions issued in *Geneva College v. Sebelius*, and a preliminary injunction and permanent injunction issued in the related cases of *Most Reverend David A. Zubik v. Sebelius* and *Most Reverend Lawrence T. Persico v. Sebelius*. The *Zubik* and *Persico* appeals were consolidated and now have also been consolidated with the *Geneva* appeal.

### 1. *Geneva* Appellee

Appellee Geneva College ("Geneva") is a nonprofit institution of higher learning established by the Reformed Presbyterian Church of North America. Geneva believes that

---

[7] The District Courts in these cases had jurisdiction pursuant to 28 U.S.C. § 1331, and this Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 1291, 1292(a)(1).

it would be sinful and immoral for it to intentionally participate in, pay for, facilitate, enable, or otherwise support access to abortion (including emergency contraceptives Plan B and ella, and two intrauterine devices, all of which Geneva characterizes as causing abortion) because such participation violates religious prohibitions on murder. Geneva contracts with an insurance issuer for its student and employee health insurance plans.

## 2. *Geneva* District Court Opinions

The District Court granted Geneva's motion for a preliminary injunction with respect to its student plan on June 18, 2013, and enjoined the government from applying or enforcing 42 U.S.C. § 300gg-13(a)(4) and requiring that Geneva's student health insurance plan, its plan broker, or its plan insurer provide "abortifacients" contrary to Geneva's religious objections. (J.A. 35-36.) The District Court began by stating that the Supreme Court has cautioned courts to be reluctant to "dissect religious beliefs" when engaging in a substantial burden analysis. (J.A. 24 (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981)).)

The District Court concluded that Geneva had shown a likelihood of success on the merits with respect to the presence of a substantial burden under RFRA and found that three Supreme Court free exercise cases supported Geneva's argument regarding the presence of a substantial burden under RFRA. First, it noted that in *Yoder*, 406 U.S. at 234-35, a state compulsory education law for children up to age sixteen, with a penalty of a criminal fine, violated the free exercise rights of the Amish plaintiffs. Second, in *Sherbert*, 374 U.S. at 410, the state could not withhold unemployment

21

benefits from a worker who refused employment on the grounds that working Saturdays violated her religious beliefs. Third, in *Thomas*, 450 U.S. at 719, the state could not deny unemployment benefits to a worker whose religious beliefs forbade his participation in manufacturing tanks for use by the military. The District Court interpreted these cases as standing for the proposition that these indirect burdens on religious exercise are substantial enough to be cognizable under RFRA. The District Court concluded that Geneva had only two choices under the regulations—either provide the objected-to coverage or drop its health insurance—and by being forced to choose between those two options, both repugnant to its religious beliefs,[8] Geneva faced a substantial burden.

The District Court then granted Geneva's second motion for a preliminary injunction, this time with respect to

---

[8] We recognize that the appellees believe providing health insurance to their employees and students is part of their religious commitments. The appellees urge, at most, that dropping their health insurance coverage would be a violation of their moral beliefs, but they do *not* argue that it would be, in and of itself, another substantial burden imposed on their religious exercise. (Geneva Br. at 5 ("To fulfill its religious commitments and duties in the Christ-centered educational context, the College promotes the spiritual and physical well-being and health of its employees and students. This includes the provision of general health insurance to employees and their dependants and the facilitation of a student health plan."); Zubik/Persico Br. at 6 ("As part of overseeing their affiliates and as part of Catholic social teaching, the Dioceses provide self-insured health plans for Diocesan entities, including the Affiliates.").)

22

its employee plan, on December 23, 2013. The District Court again enjoined the government from enforcing 42 U.S.C. § 300gg-13(a)(4) and requiring that Geneva's employee health insurance plan, its plan broker, or its plan insurer provide "abortifacients" contrary to Geneva's religious objections. (J.A. 67-68.) The District Court concluded that Geneva had shown a likelihood of success on the merits as to the presence of a substantial burden because the self-certification process forced Geneva to facilitate access to services it finds religiously objectionable. First, the District Court emphasized that a court must assess the intensity of the coercion and pressure from the government, rather than looking at the merits of the religious belief. (J.A. 58 (citing *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013), *cert. denied sub nom. Burwell v. Korte*, 134 S. Ct. 2903 (2014), and *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1137 (10th Cir.), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014)).) The District Court analogized to cases involving the contraceptive coverage mandate for entities *not* eligible for the accommodation, such as the *Hobby Lobby* opinion in the Court of Appeals for the Tenth Circuit, which found that the substantial fines and penalties imposed on an entity that refused to offer health care coverage to its employees at all, or refused to provide coverage for the mandated preventive services, constituted a substantial burden.

The District Court was convinced by Geneva's explanation that, although Geneva must engage in the same conduct that it did before the ACA—namely, notify the insurance carrier that it would not provide coverage for the objected-to services—the effect of that conduct is now different. Before the ACA, Geneva's notification resulted in

23

its employees being unable to obtain coverage for contraceptive services; after the ACA, Geneva's employees are still provided access to the services as a matter of law. "Under the ACA, Geneva has two choices: (1) provide insurance coverage to its employees, which will result in coverage for the objected to services; or (2) refuse to provide insurance coverage for its employees, which will result in fines, harm to its employees' well-being and competitive disadvantages. Both options require Geneva to act contrary to its religious duties and beliefs." (J.A. 61 n.12.)

Geneva argues that the District Court was correct that a substantial burden is present here because (1) complying with either the contraceptive coverage requirement or the accommodation would cause Geneva to "trigger," "facilitate," or be "complicit" in the commission of acts that it likens to abortion; and (2) the fines that Geneva faces for its refusal to comply with the contraceptive coverage requirement or the accommodation would pressure it to conform.

### 3. *Zubik/Persico* Appellees

Appellees in the *Zubik* and *Persico* cases include: the Bishop of Pittsburgh, David A. Zubik, and the Bishop of Erie, Lawrence T. Persico; the Diocese of Pittsburgh and the Diocese of Erie, both of which qualify for the exemption to the contraceptive coverage requirement under 45 C.F.R. § 147.131(a); and Catholic Charities of the Diocese of Pittsburgh, Prince of Peace Center, St. Martin Center, and Erie Catholic Cathedral Preparatory School, which are all nonprofit organizations affiliated with the Catholic Church. The Catholic religious nonprofit organizations are controlled by their respective Dioceses and operate in accordance with Catholic doctrine and teachings. The Bishops oversee the

24

management of the affiliated nonprofits with regard to adherence to Catholic doctrine. The Catholic faith prohibits providing, subsidizing, initiating, or facilitating insurance coverage for sterilization services, contraceptives, other drugs that the Catholic Church believes to cause abortion, and related reproductive educational and counseling services. The Dioceses provide self-insured health plans to the nonprofits and contract with third-party administrators to handle claims administration of the plans. As a result of their provision of coverage to the nonprofits, the Dioceses, which are otherwise exempt, must comply with the contraceptive coverage requirement as to the nonprofits.

### 4. *Zubik/Persico* District Court Opinions

The District Court issued a preliminary injunction that applied to both the *Zubik* and *Persico* cases on November 21, 2013, and converted that injunction into a permanent injunction on December 20, 2013.

The District Court characterized the issue before it as "whether [the appellees], being non-secular in nature, are likely to succeed on the merits of proving that their right to freely exercise their religion has been substantially burdened by the 'accommodation' which requires the Bishops of two separate Dioceses . . . to sign a form which thereby facilitates/initiates the provision of contraceptive products, services, and counseling." (J.A. 116.) The *Zubik/Persico* appellees conceded that they have provided similar information as is required by the self-certification form to their third-party administrator in the past. However, their past actions barred the provision of contraceptive products, services, or counseling. Now, under the ACA, this information will be used to "facilitate/initiate the provision of

25

contraceptive products, services, or counseling – in direct contravention to their religious tenets." (*Id.*) Accordingly, the District Court concluded that the government is impermissibly asking the appellees for documentation for what the appellees sincerely believe is an immoral purpose, and thus "they cannot provide it." (J.A. 117.) In conclusion, the District Court acknowledged that the accommodation allows the appellees to avoid directly paying for contraceptive services by shifting responsibility for providing contraceptive coverage. Despite this fact, because the appellees had a sincerely held belief that this shift in responsibility did not exonerate them from the moral implications of the use of contraception, the accommodation imposed a substantial burden.

Furthermore, the District Court held that the differing application of the exemption and the accommodation—the former applying to the Catholic Church, and the latter applying to Catholic nonprofit organizations—has the effect of dividing the Catholic Church, thereby imposing a substantial burden. "[T]he religious employer 'accommodation' separates the 'good works (faith in action) employers' from the 'houses of worship employers' within the Catholic Church by refusing to allow the 'good works employers' the same burden-free exercise of their religion" under the exemption. (J.A. 118.) The District Court questioned why religious employers who share the same religious tenets are not exempt, or why all religious employers do not fall within the accommodation, such that "even though [the appellees] here share identical, religious beliefs, and even though they share the same persons as the religious heads of their organizations, the heads of [the appellees'] service organizations may not fully exercise their

26

right to those specific beliefs, when acting as the heads of the charitable and educational arms of the Church." (J.A. 118, 120.) The District Court concluded that "the religious employer 'exemption' enables some religious employers to completely eliminate the provision of contraceptive products, services, and counseling through the Dioceses' health plans and third parties," whereas "the religious employer 'accommodation' requires other religious employers (often times the same member with the same sincerely-held beliefs) to take affirmative actions to facilitate/initiate the provision of contraceptive products, services, and counseling – albeit from a third-party." (J.A. 120-21.)

The *Zubik*/*Persico* appellees argue that the District Court was correct in finding a substantial burden because (1) they interpret the accommodation to require them to authorize and designate a third party to add the objectionable coverage to their plans, in violation of their sincerely held religious beliefs that they cannot provide or facilitate that coverage; and (2) the different scope of the religious employer exemption and the accommodation impermissibly splits the Catholic Church.

The government, as appellant in both the *Zubik*/*Persico* and *Geneva* appeals, argues that the District Courts were incorrect and the appellees are not subject to a substantial burden, because the submission of the form is not in itself burdensome and does not give rise to the coverage. Rather, *federal law* requires third parties—insurance issuers and third-party administrators—to provide coverage after the appellees refuse to provide contraceptive coverage themselves. By invoking the accommodation process, the appellees do not facilitate the provision of contraceptive

27

coverage by third parties. Rather, the third parties providing coverage do so as a result of legal obligations imposed by the ACA.

## II.  DISCUSSION

### A. Standard of Review

We employ a tripartite standard of review for preliminary injunctions. "We review the District Court's findings of fact for clear error. Legal conclusions are assessed de novo. The ultimate decision to grant or deny the injunction is reviewed for abuse of discretion." *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.,* 307 F.3d 243, 252 (3d Cir. 2002)). The same framework applies to the review of a grant of a permanent injunction. *See United States v. Bell*, 414 F.3d 474, 477-78 (3d Cir. 2005).[9] Because we conclude that the appellees have not demonstrated a likelihood of success on the merits of their

---

[9] "A party seeking a preliminary injunction must show:  (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). It is the plaintiff's burden to establish every element in its favor. *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005). A permanent injunction requires actual success on the merits. *See Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001).

RFRA claim, we need not reach the other prongs of the injunction analysis.

## B. Likelihood of Success as to Substantial Burden

### 1. Trigger/Facilitation/Complicity

#### Argument

We first must identify what conduct the appellees contend is burdensome to their religious exercise. It is not the act of filling out or submitting EBSA Form 700 itself. The appellees conceded at oral argument that the mere act of completing EBSA Form 700 does not impose a burden on their religious exercise.

The appellees' essential challenge is that providing the self-certification form to the insurance issuer or third-party administrator "triggers" the provision of the contraceptive coverage to their employees and students. The appellees reframed this proposition at oral argument, stating that the accommodation requires them to be "complicit" in sin. Appellees urge that there is a causal link between providing notification of their religious objection to providing contraceptive coverage and the offering of contraceptive coverage by a third party. That link, they argue, makes them complicit in the provision of certain forms of contraception, which is prohibited by their religious beliefs.

Without testing the appellees' religious beliefs, we must nonetheless objectively assess whether the appellees' compliance with the self-certification procedure does, in fact, trigger, facilitate, or make them complicit in the provision of

29

contraceptive coverage. Through RFRA's adoption of the Supreme Court's pre-*Smith* free exercise jurisprudence, Congress has required qualitative assessment of the merits of the appellees' RFRA claims. *See Korte*, 735 F.3d at 705 (Rovner, J., dissenting).[10] "It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 303 (1985). Furthermore, the Supreme Court has stated that "[a] governmental burden on religious liberty is not insulated from review simply because it is indirect; but the nature of the burden is relevant to the standard that the government must meet to justify the burden." *Bowen v. Roy*, 476 U.S. 693, 706-07 (1986) (citation omitted). These principles were applied in *Lyng,* where the Supreme Court recognized that the Native American respondents' beliefs were sincere, and that the government's proposed actions would have severe adverse effects on their religious practice. However, the Court disagreed that the burden on the respondents' belief was "*heavy enough* to violate the Free Exercise Clause unless the

---

[10] We note that the *Korte* majority opinion may have been undermined by the later decision of the Court of Appeals for the Seventh Circuit in *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 554 (7th Cir. 2014), *petition for cert. filed*, No. 14-392 (Oct. 3, 2014). The majority opinion in *Notre Dame*, decided after *Korte* but before *Hobby Lobby*, analyzes the mechanics of the accommodation and weakens the *Korte* majority's urge for deference. This type of analysis remains good law after *Hobby Lobby*. *See Priests for Life*, 772 F.3d 229, 247 (D.C. Cir. 2014).

Government can demonstrate a compelling need to complete the . . . road to engage in timber harvesting in the . . . [challenged] area." 485 U.S. at 447 (emphasis added).

While the Supreme Court reinforced in *Hobby Lobby* that we should defer to the reasonableness of the appellees' religious beliefs, this does not bar our objective evaluation of the nature of the claimed burden and the substantiality of that burden on the appellees' religious exercise. This involves an assessment of how the regulatory measure actually works. Indeed, how else are we to decide whether the appellees' religious exercise is substantially burdened? "[T]here is nothing about RFRA or First Amendment jurisprudence that requires the Court to accept [the appellees'] characterization of the regulatory scheme on its face." *Mich. Catholic Conference & Catholic Family Servs.*, 755 F.3d 372, 385 (6th Cir. 2014) (quoting *Roman Catholic Archbishop of Wash. v. Sebelius*, 19 F. Supp. 3d 48, 71 (D.D.C. 2013)). We may consider the nature of the action required of the appellees, the connection between that action and the appellees' beliefs, and the extent to which that action interferes with or otherwise affects the appellees' exercise of religion—all without delving into the appellees' beliefs. *See, e.g.*, *Korte*, 735 F.3d at 710 (Rovner, J., dissenting). For example, the court in *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008), "[a]ccept[ed] as true the factual allegations that Kaemmerling's beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegations, that his religious exercise is substantially burdened." The court further explained: "we conclude that Kaemmerling does not allege facts sufficient to state a substantial burden on his

31

religious exercise because he cannot identify any 'exercise' which is the subject of the burden to which he objects." *Id*.[11]

The Supreme Court in *Hobby Lobby* evaluated whether the requirement to provide contraceptive coverage absent the accommodation procedure substantially burdened the religious exercise of the owners of closely-held, for-profit corporations. The issue of whether there is an actual burden was easily resolved in *Hobby Lobby*, since there was little doubt that the actual *provision* of services did render the plaintiffs "complicit." And in *Hobby Lobby*, the Court came to its conclusion that, *without any accommodation*, the contraceptive coverage requirement imposed a substantial burden on the religious exercise of the for-profit corporations, because those plaintiffs were required to either provide health insurance that included contraceptive coverage, in violation of their religious beliefs, or pay substantial fines.[12] *See* 134

---

[11] The *Zubik*/*Persico* appellees argue that we should not independently analyze the burdens imposed on them, or the substantiality of that burden, because the government stipulated to facts contained in the appellees' declarations—particularly, that the appellees believe that participation in the accommodation, including signing the self-certification form, facilitates moral evil in violation of Catholic doctrine. The appellees are mistaken, because the government's factual stipulation does not preclude this Court from determining the contours of the asserted burden or whether the burden is substantial.

[12] Indeed, Justice Alito's majority opinion in *Hobby Lobby* comments favorably on the accommodation procedure at issue here, which separates an eligible organization from the objected-to contraceptive services:

HHS itself has demonstrated that it has at its disposal an approach that is less restrictive than requiring employers to fund contraceptive methods that violate their religious beliefs. As we explained above, HHS has already established an accommodation for nonprofit organizations with religious objections. Under that accommodation, the organization can self-certify that it opposes providing coverage for particular contraceptive services. If the organization makes such a certification, the organization's insurance issuer or third-party administrator must "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan" and "[p]rovide separate payments for any contraceptive services required to be covered" without imposing "any cost-sharing requirements . . . on the eligible organization, the group health plan, or plan participants or beneficiaries."

We do not decide today whether an approach of this type complies with RFRA for purposes of all religious claims. At a minimum, however, it does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well.

33

S. Ct. at 2775-76; *see also Priests for Life*, 772 F.3d at 245. Here, the appellees are *not* faced with a "provide" or "pay" dilemma because they have a third option—notification pursuant to the accommodation—to avoid both providing contraceptive coverage to their employees and facing penalties for noncompliance with the contraceptive coverage requirement.

The appellees urge that a burden exists here because the submission of the self-certification form triggers, facilitates, and makes them complicit in the provision of objected-to services. But after testing that assertion, we cannot agree that the submission of the self-certification form has the effect the appellees claim. First, the self-certification form does not trigger or facilitate the provision of contraceptive coverage because coverage is mandated to be otherwise provided by federal law. *Federal law*, rather than any involvement by the appellees in filling out or submitting the self-certification form, creates the obligation of the insurance issuers and third-party administrators to provide coverage for contraceptive services. As Judge Posner has explained, this is not a situation where the self-certification form enables the provision of the very contraceptive services that the appellees find sinful. Rather, "[f]ederal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured plans, to cover contraceptive services." *Notre Dame*, 743 F.3d at 554. Thus, federal law, not the submission of the self-certification form, enables the provision of contraceptive coverage.

---

*Hobby Lobby*, 134 S. Ct. at 2782 (alterations in original) (footnotes omitted) (citations omitted).

The Court of Appeals for the Sixth Circuit adopted Judge Posner's logic that the obligation to cover contraception is not triggered by the act of self-certification. Rather, it is triggered by the force of law—the ACA and its implementing regulations. *See Mich. Catholic Conference*, 755 F.3d at 387 ("Submitting the self-certification form to the insurance issuer or third-party administrator does not 'trigger' contraceptive coverage; it is federal law that requires the insurance issuer or the third-party administrator to provide this coverage."). Most recently, and after the Supreme Court's opinion in *Hobby Lobby*, the Court of Appeals for the D.C. Circuit agreed with these courts' explanations of the mechanics of the accommodation. *See Priests for Life*, 772 F.3d at 252 ("As the Sixth and Seventh Circuits have also concluded, the insurers' or [the third-party administrators'] obligation to provide contraceptive coverage originates from the ACA and its attendant regulations, not from Plaintiffs' self-certification or alternative notice."). Thus, submitting the self-certification form means only that the eligible organization is not providing contraceptive coverage and will not be subjected to penalties. By participating in the accommodation, the eligible organization has no role whatsoever in the provision of the objected-to contraceptive services.[13]

---

[13] Geneva argues that there is no guarantee that its employees and students would obtain the objected-to contraceptive coverage if they were not enrolled in Geneva's health plans. Therefore, Geneva asserts, the obligation to provide contraceptive coverage arises only because it sponsors an employee or student health plan. Geneva cites the following passage from *Notre Dame* in support: "By refusing to fill out

Moreover, the regulations specific to the *Zubik* and *Persico* appellees' self-insured plan are no different in this respect, and in no way cause the appellees to facilitate or trigger the provision of contraceptive coverage. Those Department of Labor regulations state that EBSA Form 700 "shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered." 29 C.F.R. § 2510.3-16(b). The *Zubik/Persico* appellees argue that these regulations cause it to "facilitate" the provision of contraceptives because the signed self-certification form authorizes the third-party administrator to serve as the plan administrator. However, this purported

_____

the form Notre Dame would subject itself to penalties, but Aetna and Meritain would still be required by federal law to provide the services to the university's students and employees *unless and until their contractual relation with Notre Dame terminated.*" 743 F.3d at 554 (emphasis added). However, Geneva's argument is unavailing. The provision of contraceptive coverage is not dependent upon Geneva's contract with its insurance company. "Once [the appellees] opt out of the contraceptive coverage requirement, . . . contraceptive services are not provided to women because of [the appellees'] contracts with insurance companies; they are provided because federal law requires insurers and TPAs to provide insurance beneficiaries with coverage for contraception." *Priests for Life*, 772 F.3d at 253. "RFRA does not entitle [the appellees] to control their employees' relationships with other entities willing to provide health insurance coverage to which the employees are legally entitled." *Id.* at 256.

causal connection is nonexistent. The eligible organization has no effect on the designation of the plan administrator; instead, it is *the government* that treats and designates the third-party administrator as the plan administrator under ERISA. *See Notre Dame*, 743 F.3d at 555. "[The appellees] submit forms to communicate their decisions to opt out, not to authorize [the third-party administrators] to do anything on their behalf. The regulatory treatment of the form as sufficient under ERISA does not change the reality that the objected-to services are made available because of the regulations, not because [the appellees] complete a self-certification." *Priests for Life*, 772 F.3d at 254-55. Indeed, this "opt-out" is just that—an indication that the eligible organization chooses not to provide coverage for the objected-to services.

Moreover, the submission of the self-certification form does not make the appellees "complicit" in the provision of contraceptive coverage. If anything, because the appellees specifically state on the self-certification form that they *object* on religious grounds to providing such coverage, it is a declaration that they will *not be complicit* in providing coverage. Ultimately, the regulatory notice requirement does not necessitate any action that interferes with the appellees' religious activities. "The organization must send a single sheet of paper honestly communicating its eligibility and sincere religious objection in order to be excused from the contraceptive coverage requirement." *Id.* at 249. The appellees "need only reaffirm [their] religiously based opposition to providing contraceptive coverage, at which point third parties will provide the coverage separate and apart from [the appellees'] plan of benefits." *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 7 F. Supp. 3d 88,

37

104 (D.D.C. 2013), *aff'd, Priests for Life*, 772 F.3d 229 (D.C. Cir. 2014). The appellees' real objection is to what happens after the form is provided—that is, to the actions of the insurance issuers and the third-party administrators, required by law, once the appellees give notice of their objection. "RFRA does not grant [the appellees] a religious veto against plan providers' compliance with those regulations, nor the right to enlist the government to effectuate such a religious veto against legally required conduct of third parties." *Priests for Life*, 772 F.3d at 251. "The fact that the regulations require the insurance issuers and third-party administrators to modify their behavior does not demonstrate a substantial burden on the [appellees]." *Mich. Catholic Conference*, 755 F.3d at 389.[14]

---

[14] A hypothetical example serves as a useful tool to demonstrate the fallacy in the appellees' characterization of the accommodation: Assume that a person, John Doe, has a job that requires twenty-four-hour coverage, such as an emergency room doctor or nurse. John Doe is unable to work his shift on a certain Tuesday, as that day is a religious holiday that mandates a day of rest. As a result, John Doe believes that it is inappropriate for *anyone* to work on that holiday. John Doe can request time off by filling out a certain form, but he will be penalized if he fails to show up for work without appropriately requesting time off. However, by filling out this form, he believes that he will facilitate or trigger or be complicit in someone else working in his place on the religious holiday. John Doe sincerely believes that the simple filling out of the time-off request imposes a substantial burden on his religious beliefs. In this example, John Doe, like the appellees, is able to *express* his religious objection to working on a religious holiday by declining to work that day.

Thus, we cannot agree with the appellees' characterization of the effect of submitting the form as triggering, facilitating, or making them complicit in the provision of contraceptive coverage. At oral argument, the appellees argued that it was not merely the filing of the form that imposed a burden, but, rather, what follows from it. But free exercise jurisprudence instructs that we are to examine the act the appellees must perform—not the effect of that act—to see if it burdens substantially the appellees' religious exercise. The Supreme Court has consistently rejected the argument that an independent obligation on a third party can

John Doe's time-off request indicates that he will *not* be complicit in working on the religious holiday. Furthermore, declining to work on that Tuesday does *not* serve as a trigger or facilitator because one of his other colleagues will be forced to work that day, regardless of whether John Doe works or not. However, just because John Doe does not wish to be associated with or play any role in the result (working on a religious holiday), does not mean the conduct to which he objects (filling out the time-off request form) substantially burdens his free exercise of religion. Just as we cannot conclude that John Doe's religious exercise is being burdened by filling out the form, we cannot conclude that the appellees' religious exercise is burdened by filling out the self-certification form. Furthermore, any "coercive" force attached to John Doe's refusal to fill out the time-off request is similar to the fines that the appellees face if they refuse to either participate in the accommodation or provide contraceptive coverage. In any event, such "coercive" force is relevant *only* if the conduct itself actually does substantially burden one's religious exercise. That is not the case in this analogy, and it is not the case for the appellees.

39

impose a substantial burden on the exercise of religion in violation of RFRA, as we discuss below. Pre-*Smith* free exercise cases, which RFRA was crafted to resurrect, have distinguished between what a challenged law requires the objecting parties to do, and what it permits another party— specifically, the government—to do.

In *Bowen*, the Supreme Court determined that the Free Exercise Clause did not require the government to accommodate a religiously based objection to the statutory requirement that a Social Security number be provided to applicants for certain welfare benefits. Roy, a Native American, argued that the government's use of his daughter's Social Security number would "'rob the spirit' of his daughter and prevent her from attaining greater spiritual power." 476 U.S. at 696. Roy's claim was unsuccessful because "[t]he Federal Government's use of a Social Security number for . . . [his daughter] d[id] not itself in any degree impair Roy's 'freedom to believe, express, and exercise' his religion." *Id.* at 700. Rather, Roy was attempting to use the Free Exercise Clause to dictate how the government should transact its business.

> Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family. The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens. Just as the Government may not insist

that appellees engage in any set form of religious observance, so appellees may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter. "[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government." . . . The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures.

*Id.* at 699-700 (quoting *Sherbert*, 374 U.S. at 412 (Douglas, J., concurring)).

And, echoing the principles of *Bowen*, in *Lyng*, members of Native American tribes claimed that the federal government violated their rights under the Free Exercise Clause by permitting timber harvesting and construction on land used for religious purposes. 485 U.S. at 441-42. The Supreme Court concluded that the Free Exercise Clause "does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions." *Id.* at 450-51.

Building on this line of cases, the Court of Appeals for the D.C. Circuit concluded that a federal prisoner failed to

41

state a RFRA claim when he sought to enjoin application of the DNA Analysis Backlog Elimination Act on the basis that DNA sampling, storage, and collection without limitations violated his religious beliefs about the proper use of the "building blocks of life." *Kaemmerling*, 553 F.3d at 674. Kaemmerling could not state a claim that his religious exercise was substantially burdened because he did not identify any religious exercise that was subjected to the burden to which he objected:

> The government's extraction, analysis, and storage of Kaemmerling's DNA information does not call for Kaemmerling to modify his religious behavior in any way—it involves no action or forbearance on his part, nor does it otherwise interfere with any religious act in which he engages. Although the government's activities with his fluid or tissue sample after the BOP takes it may offend Kaemmerling's religious beliefs, they cannot be said to hamper his religious exercise because they do not "pressure [him] to modify his behavior and to violate his beliefs."

*Id.* at 679 (alteration in original) (quoting *Thomas,* 450 U.S. at 718). "Like the parents in *Bowen,* Kaemmerling's opposition to government collection and storage of his DNA profile does not contend that any act of the government pressures him to change his behavior and violate his religion, but only seeks to require the government itself to conduct its affairs in conformance with his religion." *Id.* at 680.

42

Thus, the case law clearly draws a distinction between what the law may impose on a person over religious objections, and what it permits or requires a third party to do. Although that person may have a religious objection to what the government, or another third party, does with something that the law requires to be provided (whether it be a Social Security number, DNA, or a form that states that the person religiously objects to providing contraceptive coverage), RFRA does not necessarily permit that person to impose a restraint on another's action based on the claim that the action is religiously abhorrent.

These cases confirm that we can, indeed should, examine the nature and degree of the asserted burden to decide whether it amounts to a substantial burden under RFRA. Furthermore, we must assess how the objected-to action relates to the appellees' religious exercise, and whether the appellees' objections focus on the action itself or the result of the action, i.e., the obligations placed upon a third party.

Far from "triggering" the provision of contraceptive coverage to the appellees' employees and students, EBSA Form 700 totally removes the appellees from providing those services. "[T]he regulations provide an opt-out mechanism that shifts to third parties the obligation to provide contraceptive coverage to which health insurance beneficiaries are entitled, and that fastidiously relieves [the appellees] of any obligation to contract, arrange, pay, or refer for access to contraception . . . ." *Priests for Life*, 772 F.3d at 252. The self-certification form requires the eligible organization or its plan to provide a copy to the organization's insurance issuer or third-party administrator in

order for the plan to be administered in accordance with both the eligible organization's religious objection and the contraceptive coverage requirement. The ACA already takes into account beliefs like those of the appellees and *accommodates* them. "The accommodation in this case consists in the organization's . . . washing its hands of any involvement in contraceptive coverage, and the insurer and the third-party administrator taking up the slack under compulsion of federal law." *Notre Dame*, 743 F.3d at 557. The regulations accommodate the interests of religious institutions that provide health services, while not curtailing the public interest that motivates the federally mandated requirement that such services shall be provided to women free of charge. *Id.* at 551.

Because we find that the self-certification procedure does not cause or trigger the provision of contraceptive coverage, appellees are unable to show that their religious exercise is burdened. Even if we were to conclude that there is a burden imposed on the appellees' religious exercise, we would be hard-pressed to find that it is substantial. Whether a burden is "substantial" under RFRA is a question of law, not a question of fact. *See Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011). RFRA's reference to "substantial" burdens expressly calls for a qualitative assessment of the burden that the accommodation imposes on the appellees' exercise of religion. *Korte*, 735 F.3d at 705 (Rovner, J., dissenting). RFRA calls for a threshold inquiry into the nature of the burden placed on the appellees' free exercise of religion: "substantial" is a term of degree that invites the courts to distinguish between different types of burdens. *Id.* at 708.

We have stated that a substantial burden exists where (1) "a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other [persons] versus abandoning one of the precepts of his religion in order to receive a benefit"; or (2) "the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *See Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007) (interpreting a related statute, the Religious Land Use and Institutionalized Persons Act, which applies to prisoner and land use cases). However, a government action does not constitute a substantial burden, even if the challenged action "would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs," if the government action does not coerce the individuals to violate their religious beliefs or deny them "the rights, benefits, and privileges enjoyed by other citizens." *Lyng,* 485 U.S. at 449. Under this definition, can the submission of the self-certification form, which relieves the appellees of any connection to the provision of the objected-to contraceptive services, really impose a "substantial" burden on the appellees' free exercise of religion? We think not. While *Hobby Lobby* rejected the argument that the burden was too attenuated because the actual use of the objected-to contraceptive methods was a matter of individual choice, here, where the actual provision of contraceptive coverage is by a third party, the burden is not merely attenuated at the outset but totally disconnected from the appellees.

The reasoning of the District Courts was misguided in two ways. First, the District Courts accepted the appellees' characterization of the accommodation as causing them to

45

"facilitate," act as the "central cog," or serve as the "necessary stimulus" for the provision of the objected-to contraceptive services. (J.A. 60-61.) For the reasons we have detailed, we cannot accept that characterization as a matter of fact or law. Second, the District Courts focused on the coercive effect, i.e., the fact that the appellees faced a choice: submit the self-certification form and "facilitate" the provision of contraceptive coverage, or pay fines for noncompliance. However, now that we have dispelled the notion that the self-certification procedure is burdensome, we need not consider whether the burden is substantial, which involves consideration of the intensity of the coercion faced by the appellees. We will accordingly reverse the challenged injunctions.

## 2. Dividing the Catholic Church Argument

### in *Zubik/Persico*

The appellees in *Zubik/Persico* argue that a second substantial burden is imposed on their religious exercise in that the contraceptive coverage regulatory scheme improperly partitions the Catholic Church by making the Dioceses eligible for the exemption, while the Catholic nonprofits can only qualify for the accommodation, even though all the Catholic entities share the same religious beliefs. The District Court agreed with the appellees and concluded that the contraceptive mandate "would cause a division between the Dioceses and their nonprofit, religious affiliated/related spiritual/charitable/educational organizations which fulfill portions of Dioceses' mission. Further, any nonprofit, religious affiliated/related organizations expelled from the Dioceses' health insurance plans would require significant

46

restructuring of the plans which would adversely affect the benefits received from pooling resources." (J.A. 76 (citation omitted).) We conclude that the inclusion of houses of worship in the exemption and religious nonprofits in the accommodation does not impose a substantial burden on the *Zubik/Persico* appellees.

The definition of a "religious employer" who receives an exemption from the contraceptive coverage requirement under the regulations is based on longstanding Internal Revenue Code provisions. *See* 45 C.F.R. § 147.131(a) (citing 26 U.S.C. § 6033(a)(3)(A)(i), (iii)). "[R]eligious employers, defined as in the cited regulation, have long enjoyed advantages (notably tax advantages) over other entities, without these advantages being thought to violate the establishment clause." *Notre Dame*, 743 F.3d at 560 (citation omitted) (citing *Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 666, 672-73 (1970)). The Departments chose this definition from the Internal Revenue Code to categorize the entities subject to the exemption and the accommodation because that provision was a bright line that was already statutorily codified and frequently applied: "The Departments believe that the simplified and clarified definition of religious employer continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement." 78 Fed. Reg. at 39,874; *see also* Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 8456, 8461 (proposed Feb. 6, 2013) (codified at 26 C.F.R. pt. 54; 29 C.F.R. pt. 2590, and 45 C.F.R. pts. 147, 148, & 156) ("[T]his definition was intended to focus the religious employer exemption on 'the unique relationship between a house of worship and its

47

employees in ministerial positions.'" (quoting Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011) (codified at 26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; and 45 C.F.R. pt. 147))).

Furthermore, we are not persuaded that the challenged accommodation poses any burden on the *exempted* appellees' religious exercise, particularly a burden that would require the appellees to "expel" the religious nonprofit organizations from the Dioceses' health insurance plans. *See, e.g.*, *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 987 F. Supp. 2d 232, 252 (E.D.N.Y. 2013) ("First, it is not at all clear why the Diocesan plaintiffs would have to 'expel' their non-exempt affiliates from their health plans. . . . Second, even if the law did pressure the Diocesan plaintiffs to 'expel' their affiliates, plaintiffs do not state that the Diocesan plaintiffs' religious beliefs require them to have all their affiliate organizations on a single health plan, such that 'expelling' the non-exempt affiliates would be an act forbidden by their religion.").

Thus, we cannot agree that the different treatment afforded to the Catholic Church as a house worship versus the Catholic nonprofit organizations imposes a substantial burden in violation of RFRA.

## III. CONCLUSION

We will reverse the District Courts' orders granting the challenged injunctions. Because we conclude that the appellees have not shown a likelihood of success on the merits of their RFRA claim, based on the determination that

48

the accommodation does not impose a substantial burden on their religious exercise, we need not reach the question of whether the accommodation is the least restrictive means of furthering a compelling governmental interest.