HAMILTON, Circuit Judge,
concurring.
I join Judge Posner’s opinion in full. Notre Dame is not entitled to preliminary injunctive relief at this point. While the ultimate decision on the merits of this case remains uncertain, equitable considerations weigh against a grant of a preliminary injunction now. An injunction would disrupt the status quo and temporarily cut off contraceptive coverage for hundreds or thousands of women.
What this case needs now is a trial on the merits where the relevant factual issues can be explored in depth. The limited factual record before us was made in the district court on an emergency basis in December 2013. That record was also made without the participation of the in-tervenors, who would be affected most directly by the injunction Notre Dame seeks. Since that time, also, the legal and factual landscapes shaping the issues have shifted a good deal.
Where the law is evolving rapidly and the facts are complex, the better course is usually full exploration of the evidence and thorough findings of fact by the district court, rather than reliance on sweeping legal doctrines and hypothesized or assumed facts. See Lalonde v. Textron, Inc., 369 F.3d 1, 6 (1st Cir.2004) (vacating in part dismissal of ERISA case challenging actions of employee stock ownership plan and allowing for factual development where law was “neither mature nor uniform”); Doe v. Walker, 193 F.3d 42, 46 (1st Cir.1999) (Boudin, J.) (vacating dismissal on issue with “important social and moral implications” where further factual development might make it unnecessary to decide hard case and in any event would be “likely to contribute to a more sensitive assessment of what the law ‘is’ (which, absent decisive precedent, means what it ‘should be’)”); Nelson v. IPALCO Enterprises, Inc., 2005 WL 1924332, at *3 (S.D.Ind. Aug. 11, 2005) (denying cross-motions for summary judgment to allow further factual development where applicable law was “emerging, controversial, and highly fact-sensitive”). The district court is best suited for those responsibilities even where — and perhaps especially where — the appellate courts are still debating the applicable law.
For now, however, the Supreme Court has ordered us to reconsider our earlier interlocutory decision in light of Burwell v. Hobby Lobby Stores, Inc., 573 U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014). The accommodation for religious not-for-profits like Notre Dame played a pivotal role in Hobby Lobby, but not in a way that helps Notre Dame in this case. Hobby Lobby Stores is a for-profit corporation that was not eligible for this accommodation. The very existence of the accommodation for religious not-for-profits, however, persuaded the Supreme Court that the government could achieve its purpose of making contraceptives available to employees and their families without infringing on Hobby Lobby’s religious beliefs. 134 S.Ct. at 2782.
The Court’s conclusion focused on how the accommodation allowed the employer *620 to avoid paying for contraceptives contrary to the owners’ religious beliefs while still making them available to employees and their families in a convenient and seamless way. In praising the accommodation, the Court explained that the effect of the accommodation on employees “would be precisely zero. Under that accommodation, these women would still be entitled to all FDA-approved contraceptives without cost sharing.” 134 S.Ct. at 2760. Justice Kennedy’s concurring opinion embraced the accommodation as a fully satisfactory alternative for accomplishing the government’s objectives without infringing on Hobby Lobby’s religious beliefs. 134 S.Ct. at 2786-87 (Kennedy, J., concurring). He also made clear that neither he nor the other Justices in the majority expected the government to create “a whole new program or burden on the Government” to provide the accommodation needed by the for-profit employer-plaintiffs. Id.
The accommodation for religious not-for-profits thus made it fairly easy for the Hobby Lobby Court to find that a less restrictive and equally effective alternative was available to accomplish the government’s purposes, which the Court assumed were compelling. The Court’s solution was to extend the accommodation to religious owners of closely held businesses.
What does Hobby Lobby teach us about this case? In deciding Hobby Lobby, the Supreme Court was well aware of pending lawsuits like this one, in which religious not-for-profits have challenged the accommodation itself as violating their rights under the Religious Freedom Restoration Act. The majority opinion referred to this category of cases in footnote 9 and wrote later “We do not decide today whether an approach of this type [i.e., the accommodation] complies with RFRA for purposes of all religious claims.” 134 S.Ct. at 2782 & n. 40.
Despite this inconclusive comment, it is useful to consider in turn the three principal issues under RFRA in light of the Court’s remand order after Hobby Lobby. Those issues are: (1) “substantial burden” on the exercise of religion; (2) compelling governmental interests; and (3) less restrictive alternatives.
1. Substantial Burden: Notre Dame reads Hobby Lobby as resolving conclusively in its favor the issue whether the accommodation substantially burdens its exercise of its religion. In Hobby Lobby, the Court found that the Affordable Care Act’s requirements for contraceptive coverage by for-profit employers substantially burdened the plaintiffs’ exercise of religion., The employers were required by law to contract and pay for contraceptive coverage to which the, employers’ owners objected on sincere religious grounds. The alternatives to compliance would have imposed stiff financial consequences, which the Court deemed a substantial burden. 134 S.Ct. at 2776-77. Notre Dame faces essentially the same financial consequences if it refuses to certify its eligibility for the religious accommodation.
Notre Dame finds most helpful to its position the Hobby Lobby rejection of the government’s argument that the role of the employer in contracting and paying for contraceptive coverage was too remote from an employee’s use of contraceptives to impose a substantial burden on the exercise of religion. Federal courts had no business addressing whether the plaintiffs’ religious beliefs about their moral complicity were reasonable. Id. at 2778. The Court explained:
This belief implicates a difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or *621 facilitating the commission of an immoral act by another. Arrogating the authority to provide a binding national answer to this religious and philosophical question, HHS'and the principal dissent in effect tell the plaintiffs that their beliefs are flawed. For good reason, we have repeatedly refused to take such a step.
184 S.Ct. at 2778 (footnote omitted).
The accommodation for religious not-for-proflts accepts an employer’s religious beliefs and provides a mechanism to provide coverage to employees and their families, while making sure that the employer need not contract, arrange, pay, or refer for the health care it finds objectionable on religious grounds. Notre Dame asserts, however, that the mere act of requesting the exemption substantially burdens its religious exercise because it still has an attenuated role in causing its employees and students to receive the objectionable coverage. Citing Hobby Lobby, Notre Dame asserts that its opinion or belief is beyond the reach of a federal court, apart from questions of sincerity.
It is not obvious that the reasoning of Hobby Lobby on the substantial burden issue extends to this case. There are important differences between the cases: Notre Dame challenges not the general rule but the accommodation itself, and it attempts to prevent the government from arranging for a substitute for the employer to pay for contraceptive care. Notre Dame also contends, in effect, that its religious belief can substitute for legal analysis regarding the operation of federal law.
Any student of United States history learns the central roles that religious faith and tolerance have played in the settlement of this land and in the founding of the British colonies and the modern States and the federal Republic. We have a long tradition of governing in ways that accommodate the free exercise of religion. Special treatment of religious faith and practice abounds. From conscientious objector status in the military draft to federal and state tax codes, from compulsory school attendance laws to school lunch menus, from zoning law to employment law and even fish and wildlife rules, our governments at every level have long made room for religious faith by allowing exceptions from generally applicable laws. Through such exceptions and accommodations, we respect diverse faiths, and wé govern with reasonable compromises that avoid unnecessary friction between law and faith.
As we pointed out in our first opinion in this case, the most extraordinary feature of this lawsuit is Notre Dame’s claim that the process of requesting the accommodation is itself a- substantial burden on its religious exercise. Notre Dame v. Sebelius, 743 F.3d 547, 557-58 (7th Cir.2014). True, there are rare cases in which courts have considered the possibility that an accommodation process itself might be too prolonged, intrusive, ineffective, and/or otherwise burdensome. See, e.g., Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895 (7th Cir.2005), and cases cited there dealing with land-use decisions, and United States v. Friday, 525 F.3d 938 (10th Cir.2008), and cases cited there, dealing with processes for seeking permits to kill protected wildlife for use in Native American religious practices.
The accommodation in this case, however, poses no such burdens. To take advantage of the accommodation, so that Notre Dame can avoid contracting, paying, arranging, or referring for the objectionable contraceptive care, a university official must only fill out a simple form asserting that Notre Dame is a not-for-profit employer that objects on religious grounds to the law’s contraceptive coverage require *622 ments. The official must then send the form to either the Department of Health and Human Services or the insurer or third-party administrator. Notre Dame has already done so, and it need do nothing more.
As Judge Posner’s opinion explains, Bowen v. Roy, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), weighs against Notre Dame’s claim of a substantial burden here. Roy had objected on religious grounds to the government’s use of his daughter’s Social Security number to administer federal benefits for the family. The Supreme Court rejected the challenge, holding: “The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens.” Id. at 699, 106 S.Ct. 2147.
Notre Dame’s, position is analogous. At this point, Notre Dame has requested the accommodation and provided the government with contact information for Aetna and Meritain. The government requires no further action from Notre Dame. The government has informed Aetna and Meri-tain of their federal obligations to provide contraceptive coverage that Notre Dame has been exempted from providing. The government’s steps to have others substitute for Notre Dame are parallel to the internal procedures at issue in Roy.
Notre Dame disagrees, arguing that only it can answer what it says is the religious question of whether its religious exercise is substantially burdened by the government’s actions.. But the Court rejected precisely that argument when it was advanced by Roy. “The Federal Government’s use of a Social Security number for Little Bird of the Snow does not itself in any degree impair Roy’s ‘freedom to believe, express, and exercise’ his religion.” 476 U.S. at 700-01, 106 S.Ct. 2147.
While the Court acknowledged that “Roy’s religious views may not accept this distinction between individual and governmental conduct,” id. at 701 n. 6, 106 S.Ct. 2147, the Court concluded that this was ultimately a legal question, not a religious one: “It is clear, however, that the Free Exercise Clause, and the Constitution generally, recognize such a distinction; for the adjudication of a constitutional claim, the Constitution, rather than an individual’s religion, must supply the frame of reference.” Id. Under Roy, whether the government is causing a substantial burden on a person’s religious exercise is a question of federal law. Accord, Geneva College v. Secretary of the United States Dep’t of Health and Human Services, 778 F.3d 422, 436-38 (3rd Cir.2015) (courts must consider substantial burden issue under RFRA); Priests for Life v. U.S. Dept. of Health & Human Services, 772 F.3d 229, 247-49 (D.C.Cir.2014); Michigan Catholic Conference v. Burwell, 755 F.3d 372, 385-87 (6th Cir.2014), remanded, — U.S. -, 135 S.Ct. 1914, 191 L.Ed.2d 760 (2015).
Notre Dame argues, however, that the consequence of its certification and exemption imposes the substantial burden. The consequence is that federal law then requires other entities (Meritain and Aetna) to step in as substitutes to provide contraceptive coverage directly to Notre Dame employees and students, respectively, and to their families. Notre Dame objects to this consequence on religious grounds and says it could avoid this consequence only by incurring burdensome financial penalties.
The problem with this argument is that regardless of Notre Dame’s choice- — -to provide contraceptive coverage, to invoke the accommodation for religious not-for-profits, or even not to provide any health insurance coverage at all — those employ *623 ees and students would receive contraceptive coverage through some form of health insurance. As we and other circuits have pointed out, their coverage results from federal law, not from Notre Dame’s actions.
This is an issue not of moral philosophy but of federal law. Federal courts are not required to treat Notre Dame’s erroneous legal interpretation as beyond their reach — even if that interpretation is also a sincere and religious belief. Notre Dame is not entitled to nullify the law’s benefits for others based on this mistake of law, which is the foundation of its claim of a substantial burden.[1]
As in Roy, Notre Dame’s “religious views may not accept this distinction.” 476 U.S. at 701 n. 6, 106 S.Ct. 2147. But the courts cannot substitute even the most sincere religious beliefs for legal analysis. To do so would “afford an individual a right to dictate the conduct of the Government’s internal procedures,” which the Court has expressly rejected. Id. at 700, 106 S.Ct. 2147.
A comparison to the military draft helps to illustrate the extraordinary nature of Notre Dame’s objection to the government’s accommodation and finding of substitutes for it. Federal law allows for exemption from military training and service for any person “who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form.” 50 App. U.S.C. § 456(j). (The process for claiming conscientious objector status is far more demanding than the accommodation to which Notre Dame objects, but that’s not my focus here.) Suppose a person’s religious faith leads him to believe that it is wrong for people to engage in war. He applies for conscientious objector status. .The local draft board grants him the exemption.
But suppose a board member then points out that because the objector will not be drafted, someone else will be drafted in his place. He objects again, asserting, much as Notre Dame does here, that if his exemption means someone else must substitute for him to engage in wrongdoing, he will be morally responsible for it and his religious exercise will be substantially burdened. Citing RFRA, he therefore demands that he be exempted without a substitute.
As we said in our prior opinion, that seems a “fantastic suggestion.” Notre Dame, 743 F.3d at 556. Yet Notre Damé has embraced that reasoning. It argues that national catastrophe could be avoided by treating the substitute draftee as the least restrictive means to achieve a compelling governmental purpose. See Notre Dame Rule 54 Statement at 11 n. 4. This seems wrong in two fundamental ways.
First, for reasons explained above, the arrangements the government makes to find substitutes for those given the benefit of a religious exemption are imposed as a matter of federal law, not as a result of the exemption itself. The party claiming the exemption is not entitled to raise a religious objection to the arrangements the government makes for a substitute. See Geneva College, 778 F.3d at 439 n. 14 (making similar point with example of employee who asks for time off to accommodate his religion, but who then objects to employer’s substitution for him). And not coincidentally, the government’s ability to find substitutes fits well with the Supreme *624 Court’s decision, just a few days after it decided Hobby Lobby, in a RFRA ease much more similar to this one. In Wheaton College v. Burwell, — U.S.-, 134 S.Ct. 2806, 189 L.Ed.2d 856 (2014), the Court issued an interim order allowing another religious college to invoke the exemption by notifying the government rath-' er than its insurer. The Court pointed out: “Nothing in this order precludes the Government from relying on this notice, to the extent, it considers it necessary, to facilitate the provision of full contraceptive coverage under the Act.” Id. at 2807. In other words, the Court’s order allowed the government to pass the notice on to the insurer so that the insurer could comply with its obligations under federal law. That order left Wheaton College essentially where Notre Dame is now.
Second, if even such mistaken and attenuated objections were sufficient to invoke RFRA’s stringent least-restrictive-means test, fair governance where the law imposes burdens on individuals would become nearly impossible. In the draft context, the conscientious objector could argue, much as Notre Dame does here, in favor of an all-volunteer military as a less restrictive means. Should arguments for such radical restructuring of government programs be sufficient under RFRA? And in contexts not involving national security and defense, would government accommodations of religion that require finding substitutes all have to satisfy compelling-interest, least-restrictive-means scrutiny?
For these reasons, RFRA should not be understood to recognize such mistaken views about substitutes as “substantial burdens” on religious belief. Accord, Geneva College, 778 F.3d at 438; Priests for Life, 772 F.3d at 251, 256; Michigan Catholic Conference, 755 F.3d at 388; see generally Bowen v. Roy, 476 U.S. at 699-700, 106 S.Ct. 2147; Kaemmerling v. Lappin, 553 F.3d 669, 679-80 (D.C.Cir.2008) (prisoner’s religious exercise not burdened by government’s analysis of DNA taken from his tissue sample).
2. Compelling Governmental Interest: Even if Notre Dame can ultimately show a substantial burden on its religious belief, the next major issue under RFRA is whether imposing the burden on Notre Dame furthers a “compelling governmental interest.” 42 U.S.C. § 2000bb-l. In the abbreviated district court proceedings back in December 2013, the federal government did not contest this issue because of our ruling in Korte v. Sebelius, 735 F.3d 654 (7th Cir.2013), though the government preserved its right to dispute the issue in the future.
Hobby Lobby now shows that the government has a strong argument on the compelling-interest issue. The Hobby Lobby majority assumed that the burden on'those plaintiffs would serve a compelling governmental interest. 134 S.Ct. at 2780. Justice Kennedy’s concurring opinion made clear that he viewed the governmental interests as compelling. Id. at 2786 (“It is important to confirm that a premise of the Court’s opinion is its assumption that the HHS regulation here at issue furthers a legitimate and compelling interest in the health of female employees.”). And all four dissenting Justices viewed the government interests as compelling. Id. at 2799-2801 (Ginsburg, J., dissenting). The compelling interests include women’s health, the role that access to contraception plays in enabling women to participate fully and equally in society, and significant cost savings. See 78 Fed. Reg. 39870, 39873 & nn. 22, 23, & 24 (July 2, 2013) (final rules). The D.C. Circuit has explained in detail the factual bases for the government’s compelling interests. See Priests for Life, 772 F.3d at 257-64.
*625 3. Least Restrictive Means: If the RFRA analysis proceeds to whether the accommodation for religious not-for-profits like Notre Dame is the least restrictive means of furthering the government’s interest, the question demands much more exploration than was possible in the emergency proceedings in the district court back in December 2013.
The general mandate to cover contraceptive care as part of any broad health insurance package provided by employers was intended to minimize financial, administrative, and logistical obstacles to such coverage. 78 Fed.Reg. at 39888 (rejecting alternative proposals and explaining importance of avoiding incremental costs and minimizing logistical and administrative obstacles for contraceptive coverage); Priests for Life, 772 F.3d at 265. The accommodation for religious not-for-profits has also been designed to minimize those obstacles.
Notre Dame’s suggested alternatives would all impose significant financial, administrative, and logistical obstacles by requiring women to sign up for separate coverage, either with a government agency or another private insurer, and to pay additional costs unless the government paid for the program. Such obstacles were specifically considered in Hobby Lobby. In debating whether the accommodation would suffice for the for-profit employers, the majority and dissent paid close attention to cost and to administrative and logistical obstacles. See 134 S.Ct. at 2782-83 (under the accommodation, plaintiffs’ employees would continue to receive contraceptive coverage without cost sharing and with “minimal logistical and administrative obstacles”); id. at 2802 (Ginsburg, J., dissenting) (new government program as substitute would impose obstacles to effective coverage). Those concerns about effectiveness of alternative's seem to have substantial merit. They deserve exploration in the district court.
The least-restrictive-means issue also presents a question of law for which the contours are not yet well-defined. The legal question is in essence the scope of imagination permitted in thinking of supposedly less restrictive means.
The heart of the Affordable Care Act was a decision to approach universal health insurance by expanding the employer-based system of private health insurance that had evolved in our country, rather than to substitute a new “single payer” government program to pay for health care, like the systems in place in the United Kingdom and Canada. I do not see support for Notre Dame’s view that a least-restrictive-means analysis would need to consider such radically different alternatives.
In fact, Justice Kennedy’s Hobby Lobby concurrence emphasized that the accommodation for religious not-for-profits was an “existing, recognized, workable, and already-implemented framework to provide coverage” for employees with an objecting employer. 134 S.Ct. at 2786 (Kennedy, J., concurring). In finding that the accommodation was a less restrictive alternative, Justice Kennedy noted that “the Government has not met its burden of showing that it cannot accommodate the plaintiffs’ similar religious objections under this established framework.” Id. (emphasis added). He also commented that accommodation was possible “without imposition of a whole new program or burden on the Government.” Id.
Consistent with those observations, I doubt that a hypothetical new single-payer program for contraceptives, which would require separate registration or application, would be for RFRA purposes a “less restrictive” means of achieving the government’s interests. It also seems likely that *626 such a program would impose the sort of logistical and administrative obstacles of such concern in Hobby Lobby.
Further fact-finding in the district court may cast the case in a different light, of course. But for all of these reasons, as well as those explained in Judge Posner’s opinion, I continue to agree that Chief Judge Simon properly denied a preliminary injunction in this case.

. Accord, Geneva College, 778 F.3d at 437 (3rd Cir.2015); Priests for Life, 772 F.3d at 252; Michigan Catholic Conference, 755 F.3d at 387; 78 Fed.Reg. 39870, 39876 (July 2, 2013) (final rules explaining that obligations of insurers and third-party administrators are imposed by federal law).