14-427-cv
Catholic Health Care System, et al. v. Burwell, et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: January 22, 2015                    Decided: August 7, 2015)

Docket No. 14-427-cv

_____

CATHOLIC HEALTH CARE SYSTEM, CATHOLIC HEALTH
SERVICES OF LONG ISLAND, CARDINAL SPELLMAN HIGH
SCHOOL, MONSIGNOR FARRELL HIGH SCHOOL,

*Plaintiffs-Appellees*,

v.

SYLVIA MATHEWS BURWELL, in her official capacity as
Secretary of the United States Department of Health and Human
Services, UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES, THOMAS PEREZ, in his official capacity as
Secretary of the United States Department of Labor, UNITED
STATES DEPARTMENT OF LABOR, JACOB L. LEW, in his
official capacity as Secretary of the United States Department of
Treasury, UNITED STATES DEPARTMENT OF TREASURY,

*Defendants-Appellants*.[1]

---

[1] The Clerk of the Court is directed to amend the caption as above. Sylvia Mathews Burwell is automatically substituted for Kathleen Sebelius pursuant to Fed. R. App. P. 43(c)(2).

———————————————

Before: LEVAL, POOLER, and CHIN, *Circuit Judges*.

Appeal from the United States District Court for the Eastern District of New York (Cogan, *J.*) granting, in relevant part, Plaintiffs-Appellees' motion for summary judgment and denying, in relevant part, Defendants-Appellants' cross-motion for summary judgment. We reverse, concluding that regulations promulgated under the Patient Protection and Affordable Care Act that allow religious non-profit employers to opt out of providing contraceptive coverage do not themselves substantially burden Plaintiffs' religious exercise in violation of the Religious Freedom Restoration Act.

Reversed.

———————————————

MEGAN BARBERO, Attorney, Appellate Staff, United States Department of Justice (Stuart F. Delery, Assistant Attorney General, Beth S. Brinkmann, Deputy Assistant Attorney General, Mark B. Stern, Alisa B. Klein, Adam C. Jed, Patrick G. Nemeroff, Attorneys, Appellate Staff, Kelly T. Currie, Acting United States Attorney for the Eastern District of New York, *on the brief*), Washington, DC, *for Defendants-Appellants*.

TODD R. GEREMIA (Charles M. Carberry, Toni-Ann Citera, Patrick J. Smith, Julie R. Gorla, *on the brief*), Jones Day, New York, NY, *for Plaintiffs-Appellees*.

2

Mailee R. Smith, Americans United for Life, Washington DC, *for Amici Curiae Association of American Physicians and Surgeons, et al.*

Ayesha N. Khan, Americans United for Separation of Church and State, Washington, DC, *for Amici Curiae Americans United for Separation of Church and State, et al.*

Charles E. Davidow, Paul, Weiss, Rifkind, Wharton & Garrison LLP (Andrée J. Goldsmith, Karin Dryhurst, Paul, Weiss, Rifkind, Wharton & Garrison LLP; Marcia D. Greenberger, Judith G. Waxman, Emily J. Martin, Gretchen Borchelt, Leila Abolfazli, National Women's Law Center, *on the brief*), Washington, DC, *for Amici Curiae National Women's Law Center, et al.*

Martha Jane Perkins (Dipti Singh, *on the brief*), National Health Law Program, Carrboro, NC, *for Amici Curiae National Health Law Program, et al.*

POOLER, *Circuit Judge*:

Defendants-Appellants, the Secretaries of Health and Human Services, Labor, and the Treasury, appeal from the December 16, 2013 order of the United States District Court for the Eastern District of New York (Cogan, *J.*) which, in relevant part, granted Plaintiffs-Appellees' motion for summary judgment and denied Defendants-Appellants' cross-motion for summary judgment. The district court concluded that regulations promulgated under the Patient Protection and Affordable Care Act that allow religious non-profit employers to opt out of

providing contraceptive coverage themselves violate these religious employers' rights under the Religious Freedom Restoration Act. We reverse, concluding that the challenged accommodation for religious objectors relieves, rather than imposes, any substantial burden on Plaintiffs' religious exercise, and thus does not violate the Religious Freedom Restoration Act.

**BACKGROUND**

**I. Statutory and Regulatory Background**

This case concerns regulations promulgated under the Patient Protection and Affordable Care Act of 2010 (the "ACA"), Pub. L. No. 111-148, 124 Stat. 119. The ACA generally requires employers with fifty or more full-time employees to offer "a group health plan or group health insurance coverage" that provides "minimum essential coverage." 26 U.S.C. § 5000A(f)(2); *id.* § 4980H(a)(1), (c)(2). Unless an exception applies, as part of this minimal essential coverage, the ACA requires an employer's group health plan or group health insurance coverage to furnish "preventive care and screenings" for female employees without "any cost sharing requirements." 42 U.S.C. § 300gg-13(a)(4). Without "cost sharing requirements" means without requiring plan participants and beneficiaries to make copayments or pay deductibles or coinsurance. *See* 45 C.F.R. §

147.131(c)(2)(ii). An employer whose health plan does not include the required coverage is subject to penalties of $100 per day, per affected beneficiary. 26 U.S.C. § 4980D(b). An employer who drops employee health care coverage altogether is generally subject to a penalty of $2000 per year, per employee, after the first thirty employees. *Id.* § 4980H(a), (c)(1), (c)(2)(D)(i).

The ACA does not specify what types of preventive care must be covered for female plan participants and beneficiaries. Instead, Congress left that issue to be determined via regulation by the Health Resources and Services Administration ("HRSA"), a division of the Department of Health and Human Services ("HHS"). 42 U.S.C. § 300gg-13(a)(4). In developing guidelines for preventative health services for women, HRSA requested the assistance of the Institute of Medicine ("IOM"), an arm of the National Academy of Sciences established in 1970 to inform health policy with available scientific information. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8726 (Feb. 15, 2012); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 238 (D.C. Cir. 2014).

In August 2011, consistent with IOM's recommendations, HRSA

promulgated the Women's Preventive Services Guidelines, which generally require non-exempt employers to provide "coverage, without cost sharing, for all Food and Drug Administration (FDA) approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity, as prescribed by a [health care] provider." 77 Fed. Reg. at 8725 (internal quotation marks and alterations omitted). These contraceptive coverage requirements were subsequently enacted by the three agencies responsible for the ACA's implementation – the Department of the Treasury, the Department of Labor, and HHS. *See* 26 C.F.R. § 54.9815-2713(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 45 C.F.R. § 147.130(a)(1)(iv). We refer to this required coverage as the "contraceptive coverage mandate."

The ACA and its implementing regulations create an exemption from the contraceptive coverage mandate for "religious employer[s]," a category that encompasses "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(3)(A)(i), (iii); 45 C.F.R. § 147.131(a). The government created this exemption in response to concerns from religious groups objecting to the contraceptive coverage mandate.

In response to continued objections from religiously-affiliated organizations that did not qualify for the "religious employer" exemption, the government also crafted the so-called "accommodation," which applies more broadly to religious non-profit organizations that object to providing contraceptive coverage. The accommodation was so named because it allows religious employers to opt out of paying for objectionable medical services without denying these services to employees who may or may not share the religious beliefs of their employer. Under the applicable regulations, an organization is eligible for this accommodation if it satisfies the following criteria:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
>
> (2) The organization is organized and operates as a nonprofit entity.
>
> (3) The organization holds itself out as a religious organization.
>
> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. . . .

45 C.F.R. § 147.131(b); *see also* 26 C.F.R. § 54.9815-2713A(a); 29 C.F.R. § 2590.715-

2713A(a). We refer to organizations that meet these criteria as "eligible organizations."[2]

By way of background, eligible organizations generally provide their employees insurance in one of two ways. Employers are said to have an "insured" plan if they contract with an insurance company for insurance – the insurance company bears the financial risk of paying health insurance claims. Other employers, like the Plaintiffs here, who bear the financial risk of paying claims themselves, are said to have "self-insured" plans. Many self-insured employers use insurance companies or other third parties to administer their plans, performing functions such as developing networks of providers, negotiating payment rates, and processing claims. In this context, the insurance company or other third party is called a "third-party administrator" or "TPA." *See generally* Congressional Budget Office, *Key Issues in Analyzing Major Health Insurance Proposals* 6 (2008).

---

[2] Revisions to these regulations extending the accommodation to closely held for-profit entities with similar religious objections are scheduled to take effect September 14, 2015. *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,318, 41,323 (July 14, 2015).

Under the regulations, an eligible organization is not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it has religious objections. Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39,870, 39,874 (July 2, 2013). To be relieved of these obligations, an eligible organization has two options. First, it can complete a notification form issued by the Department of Labor, indicating that it has a religious objection to providing coverage for the required contraceptive services, and send a copy to its insurance company or third-party administrator. *See id.* at 39,875; *see also* 29 C.F.R. § 2590.715-2713A(a)(4), (b)(1)(ii)(A), (c)(1)(i). This one-page self-certification form requires only the name of the organization, and the name, title, and contact information of the person signing it. *See* Department of Labor, EBSA Form 700, http://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganization certificationform.pdf.

Second, an alternative notification option stems from the Supreme Court's orders in *Little Sisters of the Poor Home for the Aged, Denver, Colorado v. Sebelius*, 134 S. Ct. 1022 (2014), and *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014). In both orders, the Supreme Court granted injunctions pending appeal to non-profits covered by the accommodation, providing that instead of self-certifying using the

9

Department of Labor's one-page form, they could instead send a letter to HHS detailing their religious objections in their own words. HHS, in turn, would then be responsible for informing the non-profits' third-party administrators to begin providing separate contraceptive coverage to the non-profits' employees. In August 2014, long after the district court's judgment in this case, HHS issued new interim final rules for non-profits that essentially codified these orders. *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 79 Fed. Reg. 51,092, 51,092 (Aug. 27, 2014). These rules were finalized in July 2015. *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,323 (July 14, 2015). Under the new rules, an eligible organization can choose to either fill out the Department of Labor's form and send it to its third-party administrator, or it can write to HHS directly using its own words or a sample letter provided by HHS. This notice to the government is not required to take a particular form, but must include information on the entity's plan name and type, along with "the name and contact information for any of the plan's third-party administrators and health insurance issuers." 29 C.F.R. § 2590.715–2713A(b)(1)(ii)(B), (c)(1)(ii).

Once an eligible organization chooses to take advantage of the accommodation and notifies its third-party administrator or HHS by using one of the methods specified by the regulations, the plan's participants and beneficiaries will generally still have access to contraceptive coverage without cost sharing through alternative mechanisms established by government regulations. When an eligible organization that chooses not to provide contraceptive coverage has a "self-insured" plan like the Plaintiffs' plans here, the regulations, depending on the type of plan, either require or incentivize[3] the third-party administrator to provide or arrange its own separate payments for contraceptive services for plan participants and beneficiaries. 29 C.F.R. § 2590.715-2713A(b)(2). Importantly, the regulations require the third-party administrator to fully divorce the eligible organization from payments for contraceptive coverage. *See id.* § 2590.715-

---

[3] When employers with self-insured plans offer insurance through what is known as a "church plan," the government lacks authority under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), to regulate the third-party administrators that administer the plans. 29 U.S.C. §§ 1002(33), 1003(b)(2). Thus, rather than requiring third-party administrators to offer contraceptive coverage once an eligible organization opts out, the regulations incentivize such coverage by providing reimbursement in excess of costs for third-party administrators. *See* 29 C.F.R. § 2590.715-2713A(b)(3); 45 C.F.R. § 156.50(d). Here, all of the Plaintiffs offer health coverage through self-insured church plans.

2713A(b)(2)(i). The regulations bar the third-party administrator from imposing any premium, fee or other charge, directly or indirectly, on the eligible organization or the group health plan with respect to payments for contraceptive services. *See id.* Instead, the third-party administrator may seek reimbursement for payments for contraceptive services directly from the federal government. *See id.* § 2590.715-2713A(b)(3); *see also* 45 C.F.R. § 156.50(d). Third-party administrators are required to "segregate" accounting for contraceptive coverage from the eligible organization's plan excluding such coverage. 29 C.F.R. § 2590.715-2713A(c)(2)(ii).[4]

In addition, an eligible organization that opts out of providing contraceptive coverage has no obligation to inform plan participants and

---

[4] Similarly, when an eligible organization that chooses not to provide coverage has an insured plan, the health insurance company that issues the policy for that organization is required by regulation to provide separate payments for contraceptive services for plan participants and beneficiaries. *See* 45 C.F.R. § 147.131(c)(2). The insurance issuer may not impose any premium, fee, or other charge, directly or indirectly, on the eligible organization or the group health plan with respect to the issuer's payments for contraceptive services. *See id.* § 147.131(c)(2)(ii). The insurance issuer must "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the . . . plan," *id.* § 147.131(c)(2)(i)(A), and "segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services," *id.* § 147.131(c)(2)(ii).

beneficiaries of the availability of these separate payments made by third parties. Instead, the third-party administrator itself provides this notice, and does so "separate from" materials that are distributed in connection with the eligible organization's group health coverage. *Id.* § 2590.715-2713A(d). Third-party administrators bear the burden of contacting beneficiaries, and eligible organizations are not required to provide these entities the names of their beneficiaries or otherwise coordinate these notices. *See id.* § 2590.715-2713A(b)(4), (c)(1)(i); *Priests for Life*, 772 F.3d at 254 (noting that "[n]o regulation related to the accommodation imposes any such duty on Plaintiffs"). Furthermore, the third-party administrator's notice must make clear that the eligible organization is neither administering nor funding the contraceptive benefits, specifying that "the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services." 29 C.F.R. § 2590.715-2713A(d).

**II. Factual Background and Procedural History**

The relevant plaintiffs on appeal are a group of religious non-profit organizations affiliated with the Roman Catholic Church.[5] Plaintiffs Cardinal

---

[5] The plaintiffs below also included the Roman Catholic Archdiocese of

13

Spellman High School and Monsignor Farrell High School are non-profit Catholic high schools located in the Bronx and Staten Island, respectively. As affiliated entities of the Roman Catholic Archdiocese of New York, Cardinal Spellman and Monsignor Farrell offer health insurance to their employees under the Archdiocese's self-insured health plan, which is administered by United Healthcare and CVS Caremark as third-party administrators. Plaintiff Catholic Health Care System (also known as ArchCare) is a non-profit organization that provides health coverage to more than 1000 employees and their dependents under a self-insured plan administered by Emblem Health and CVS Caremark. Plaintiff Catholic Health Services of Long Island is a non-profit organization that provides health coverage to approximately 11,000 employees and their dependents under three self-insured plans administered by Empire BlueCross BlueShield and Express Scripts.

While none of these entities qualify as "religious employers" under the exemption to the contraceptive coverage mandate, all of them are eligible for the

New York and the Roman Catholic Diocese of Rockville Centre, New York – both of whom are exempt from the contraceptive coverage mandate as religious employers – as well as Catholic Charities of the Diocese of Rockville Centre. The district court dismissed the claims of these plaintiffs and these decisions are not challenged on appeal.

accommodation to the mandate. Nevertheless, Plaintiffs contend that the contraceptive coverage mandate, including the accommodation, violates their rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq. RFRA provides that the government "shall not substantially burden a person's exercise of religion" unless the application of that burden is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb-1. As affiliates of the Catholic Church, Plaintiffs adhere to the Church's teachings that life begins at the moment of conception, and that "abortion-inducing" products, contraception, and sterilization are immoral.[6] Plaintiffs' beliefs forbid them from taking actions that would make them complicit in the delivery of these services, and thus they believe that they are prohibited from paying for, providing, or facilitating access to contraception. Plaintiffs argue that

---

[6] Plaintiffs contend that some forms of contraception can induce an abortion. While we do not doubt the sincerity of their beliefs, we note that the contraceptive coverage mandate deals only with drugs that fall within the FDA's definition of "contraception," not drugs which the FDA qualifies as "abortion-inducing." *See* 77 Fed. Reg. at 8725 (requiring coverage only for all "[FDA] approved contraceptive methods" and "sterilization procedures" (alterations and internal quotation marks omitted)). We recognize that Plaintiffs do not accept the FDA's proposition and argue that some of the covered methods are abortion-inducing. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2759 (2014) ("The owners of the businesses have religious objections to abortion, and according to their religious beliefs the four contraceptive methods at issue are abortifacients.").

15

opting out of the coverage requirement substantially burdens their religious exercise because they believe that by doing so, they facilitate access to products and services they find objectionable. Thus, Plaintiffs contend that the ACA leaves them with the choice of: (1) providing contraceptive coverage in violation of their religious beliefs, (2) paying significant penalties for failing to provide the required health coverage, or (3) utilizing an accommodation which also forces them to violate their religious beliefs.

Plaintiffs brought suit in district court challenging the contraceptive coverage mandate under RFRA and seeking an injunction barring its enforcement.[7] On December 16, 2013, the district court granted Plaintiffs summary judgment on their RFRA claim and denied the government's cross-motion for summary judgment as to this claim. The district court concluded that the accommodation placed a substantial burden on Plaintiffs' exercise of religion, and that the government failed to show that the accommodation was the least restrictive means to advance a compelling governmental interest. The district

---

[7] Plaintiffs, along with the Roman Catholic Archdiocese of New York, the Roman Catholic Diocese of Rockville Centre, New York, and Catholic Charities of the Diocese of Rockville Centre, also pressed other statutory and constitutional claims not relevant here.

court enjoined enforcement of the contraceptive coverage mandate against Plaintiffs and entered final judgment.

**III. Parallel Proceedings**

Plaintiffs' challenge to the contraceptive coverage mandate is not unique. Religious non-profit organizations throughout the country have brought similar RFRA challenges. In the time since the district court issued its opinion, six circuits have rejected these claims, either on the merits or by denial of a preliminary injunction. *See Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, --- F.3d ----, 2015 WL 4232096, at *3 (10th Cir. July 14, 2015); *E. Tex. Baptist Univ. v. Burwell*, --- F.3d ----, 2015 WL 3852811, at *1 (5th Cir. June 22, 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 619 (7th Cir. 2015); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422, 442 (3d Cir. 2015); *Priests for Life*, 772 F.3d at 237; *Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 390 (6th Cir. 2014), *vacated and remanded*, 135 S. Ct. 1914 (2015); *see also Wheaton Coll. v. Burwell*, --- F.3d ----, 2015 WL 3988356, at *4 (7th Cir. July 1, 2015).

These cases are still actively moving through the courts. Similar cases are pending in the Eighth and Eleventh Circuits. *See Sharpe Holdings, Inc. v. U.S. Dep't*

*of Health & Human Servs.*, No. 14-1507 (8th Cir. argued Dec. 10, 2014); *Eternal Word Television Network, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 14-12696 (11th Cir. argued Feb. 4, 2015). In addition, in light of the Supreme Court's opinion in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), the Eleventh Circuit granted an injunction prohibiting enforcement of the accommodation against the plaintiffs pending appeal. *Eternal Word Television Network, Inc. v. Sec'y, U.S. Dep't of Health & Human Servs.*, 756 F.3d 1339, 1340 (11th Cir. 2014). Earlier this year, the Supreme Court also vacated and remanded both the original Seventh Circuit opinion in *University of Notre Dame* and the Sixth Circuit opinion, which were decided prior to *Hobby Lobby*, for further consideration in light of that decision. *See Mich. Catholic Conference v. Burwell*, 135 S. Ct. 1914 (2015); *Univ. of Notre Dame v. Burwell*, 135 S. Ct. 1528 (2015). Although the Seventh Circuit reaffirmed its original conclusion on remand, *see Univ. of Notre Dame*, 786 F.3d at 619, the Sixth Circuit case remains pending. We note also that petitions for certiorari are pending for the decisions of the Third, Fifth, Tenth, and D.C. Circuits. With respect to the Third Circuit's decision, the Supreme Court declined to recall and stay issuance of the mandate, but enjoined enforcement of the accommodation

against the plaintiffs pending disposition of the petition for certiorari. *Zubik v. Burwell*, 135 S. Ct. 2924 (2015).

**DISCUSSION**

"We review *de novo* a district court's grant of summary judgment." *Byrne v. Rutledge*, 623 F.3d 46, 52 (2d Cir. 2010). We "will affirm only if, construing the evidence in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 131–32 (2d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). When, as here, we review a district court's treatment of cross-motions for summary judgment we "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne*, 623 F.3d at 53 (internal quotation marks omitted).

**I. The Religious Freedom Restoration Act**

Under the Free Exercise Clause of the First Amendment, the government may not "prohibit[] the free exercise" of religion. U.S. Const. amend. I. In 1990, the Supreme Court clarified its Free Exercise Clause jurisprudence by holding that the government need not have a compelling governmental interest in order

19

to enact neutral, generally applicable laws that happen to burden religious practice. *See Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 882–90 (1990). While consistent with much of the Supreme Court's prior free exercise precedent, *Smith* was arguably in tension with two prior Supreme Court cases, both of which the *Smith* Court declined to overrule. *Id.* at 881–85. In these cases, the Court used strict-scrutiny like analysis and asked whether the challenged law substantially burdened a religious practice and, if it did, whether that burden was justified by a compelling governmental interest. *See Wisconsin v. Yoder*, 406 U.S. 205, 220–21 (1972); *Sherbert v. Verner*, 374 U.S. 398, 405–06 (1963).

In response to *Smith*, Congress enacted RFRA, which provides in relevant part that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . . is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *see also Sossamon v. Texas*, 131 S. Ct. 1651, 1656 (2011) (noting that by enacting RFRA, Congress "intended to 'restore the compelling interest test as set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder* . . . in all cases where free exercise of religion is substantially burdened.'" (quoting 42 U.S.C. § 2000bb(b)(1))

(citation omitted)). While RFRA's "compelling interest" prong stems from *Sherbert* and *Yoder*, the "least restrictive means" prong was not used pre-*Smith*. *See City of Boerne v. Flores*, 521 U.S. 507, 509 (1997). RFRA accordingly employs a strict scrutiny standard that provides "even broader protection for religious liberty" than existed previously. *Hobby Lobby*, 134 S. Ct. at 2761 n.3. In sum, while "the Free Exercise Clause does not normally 'inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct,' . . . . RFRA, in contrast, requires strict scrutiny of such laws where the incidental burden on religion is substantial." *Hankins v. Lyght*, 441 F.3d 96, 111–12 (2d Cir. 2006) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005)).

**II. Substantial Burden**

At the threshold, RFRA requires us to assess whether Plaintiffs have shown a substantial burden on their exercise of religion. *See City of Boerne*, 521 U.S. at 533 (noting that the burden on this issue lies with the religious objector). "[I]f the law's requirements do not amount to a substantial burden under RFRA, that is the end of the matter." *Priests for Life*, 772 F.3d at 244.

Here, Plaintiffs argue that the ACA's contraceptive mandate, including the accommodation, constitutes a substantial burden on their religious exercise by

21

forcing them to choose among three unacceptable options: (1) provide contraceptive coverage, (2) pay the fines and penalties associated with failure to provide contraceptive coverage, or (3) opt out of the contraceptive coverage mandate via the accommodation, using either method of self-certification.

On its face, the final option, designed by the government to (a) extricate employers with religious objections from the provision of contraceptive coverage, and (b) place the burden for such coverage on third-party administrators, would appear to eliminate any substantial burden on Plaintiffs' religious exercise. Indeed, in *Hobby Lobby*, the Supreme Court identified this accommodation as a way to alleviate a substantial burden on the religious exercise of for-profit corporations who enjoyed only the first two options. 134 S. Ct. at 2782. Yet Plaintiffs contend that the opposite is true. Plaintiffs believe that by submitting the opt-out notification to the government or their third-party administrators, they are indirectly facilitating the provision to their employees of products and services that have contraceptive and "abortion-inducing" effects, an act which violates their religious beliefs. Thus, although the accommodation shifts the burden of providing contraceptive coverage to others once Plaintiffs avail

themselves of the opt-out mechanism, Plaintiffs nevertheless contend that the regulatory scheme imposes a substantial burden on their exercise of religion.

**A. Substantiality is an Objective Inquiry**

In analyzing the substantiality of a burden under RFRA, we employ an objective test. RFRA plaintiffs must show that the government has imposed a burden that is substantial, not simply one that they believe is substantial.

To be sure, the government concedes, and we do not doubt, the sincerity of Plaintiffs' belief that providing, paying for, or facilitating access to contraceptive services is contrary to their faith. Nor do we doubt that, in Plaintiffs' religious judgment, participation in the accommodation violates this belief. *See Priests for Life*, 772 F.3d at 247 ("Plaintiffs are correct that they – and not this Court – determine what religious observance their faith commands."). However, "[a]ccepting the sincerity of Plaintiffs' beliefs . . . does not relieve this Court of its responsibility to evaluate the substantiality of any burden on Plaintiffs' religious exercise." *Id.* Although a court accepts a litigant's sincerely held religious beliefs, it must assess the nature of a claimed burden on religious exercise to determine whether, as an objective legal matter, that burden is "substantial" under RFRA. As other circuits have recognized, "[w]hether a law substantially burdens

23

religious exercise under RFRA is a question of law for courts to decide, not a question of fact." *Id.*; *see also Little Sisters of the Poor*, 2015 WL 4232096, at *18–19; *E. Tex. Baptist Univ.*, 2015 WL 3852811, at *5; *Geneva Coll.*, 778 F.3d at 442; *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) ("[a]ccepting as true the factual allegations that [plaintiff's] beliefs are sincere and of a religious nature – but not the legal conclusion, cast as a factual allegation, that his religious exercise is substantially burdened").

Plaintiffs urge a contrary position, contending that when accepting a RFRA plaintiff's religious beliefs, a court must *also* accept the plaintiff's assessment of the magnitude of any burden on their religious exercise. Yet this conclusion would "read out of RFRA the condition that only substantial burdens on the exercise of religion trigger the compelling interest requirement." *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001); *see also Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks omitted)). If RFRA plaintiffs needed only to assert that their religious beliefs were substantially burdened, federal courts would be reduced to rubber stamps, and the government would have to defend innumerable actions under demanding strict scrutiny analysis. *See Mahoney v.*

*Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011) (concluding that judicial inquiry into the substantiality of the burden "prevent[s] RFRA claims from being reduced into questions of fact, proven by the credibility of the claimant"). As the D.C. Circuit has recognized, this position would require us to "accept a RFRA claimant's understanding of what the challenged law requires her to do (or to refrain from doing), even if that subjective understanding is at odds with what the law actually requires." *Priests for Life*, 772 F.3d at 249; *see also Univ. of Notre Dame*, 786 F.3d at 621 (Hamilton, *J.*, concurring) ("Notre Dame . . . contends, in effect, that its religious belief can substitute for legal analysis regarding the operation of federal law."). Rejecting this possibility, we conclude that the fact that a RFRA plaintiff *considers* a regulatory burden substantial does not make it a substantial burden. Were it otherwise, no burden would be insubstantial.

Contrary to Plaintiffs' suggestions, *Hobby Lobby* did not collapse the distinction between beliefs and substantial burden, such that the latter could be established simply through the sincerity of the former. It is true that the Supreme Court noted in *Hobby Lobby* that "it is not for us to say that [plaintiffs'] religious beliefs are mistaken or insubstantial." 134 S. Ct. at 2779. But that observation related to the significance of the particular belief for the religion – not to the

25

burden imposed by the governmental requirement. Consistent with a long judicial tradition, *Hobby Lobby* declined to second-guess the rationality, or demean the significance, of the plaintiffs' religious beliefs. *See id.* at 2778 (citing cases). Whether the regulation objected to imposes a substantial burden is an altogether different inquiry. Indeed, subsequent to *Hobby Lobby*, the Supreme Court has reaffirmed the independence of the belief and burden inquiries. In *Holt v. Hobbs*, the Court made clear that "[i]n addition to showing that the relevant exercise of religion is grounded in a sincerely held religious belief, petitioner *also* bore the burden of proving that the Department's grooming policy substantially burdened that exercise of religion." 135 S. Ct. 853, 862 (2015) (emphasis added).[8] Consequently, we cannot agree with Plaintiffs that *Hobby Lobby* erased RFRA's substantial burden requirement by leaving the issue to be proven solely through a plaintiff's affirmation of belief. RFRA does not speak of a burden which the affected person considers substantial. It requires a substantial burden, and assessing substantiality is a matter for a court.

---

[8] *Holt* was decided under RFRA's companion statute, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq.

**B. The Accommodation Imposes No Substantial Burden**

Applying this objective analysis to the accommodation, we conclude that Plaintiffs have failed to show a substantial burden. The regulatory accommodation here operates in a straightforward fashion. In order to be excused from the contraceptive coverage mandate, an eligible organization must send a single sheet of paper communicating its eligibility and religious objection. 29 C.F.R. § 2590.715-2713A(b)(1)(ii). Once an eligible organization expresses its desire to have no involvement in the provision of contraceptive coverage, the government requires no further action of the organization. Instead, the regulations effectuate this separation by enlisting other entities to fill the gap. The regulations require or incentivize insurers and third-party administrators to directly offer separate coverage for contraceptive services to insured employees who want it, and to inform beneficiaries that their objecting employer has no role in facilitating this coverage. *Id.* § 2590.715-2713A(b)(2), (d). In the process, eligible organizations are provided the opportunity to freely express their religious objection to such coverage as well as to extricate themselves from its provision. At the same time, insured individuals are not deprived of the benefits of contraceptive coverage.

Thus, under the challenged regulatory scheme, the only obligation actually imposed on Plaintiffs is identifying themselves as religious objectors. Through a modicum of paperwork, an eligible organization throws the entire administrative and financial burden of providing contraceptive coverage on its insurer or third-party administrator, generally organizations with no objection to providing contraceptive coverage. Indeed, in discussing the opt-out mechanism in *Hobby Lobby*, the Supreme Court explained that the accommodation "effectively exempt[s]"eligible organizations from the contraceptive coverage mandate. 134 S. Ct. at 2763.

Assessing this obligation objectively, we cannot conclude that the simple act of completing the notification form imposes a substantial burden on Plaintiffs' religious exercise. Indeed, in past decisions favoring religious objectors, the burden imposed was considerably more substantial than the burden of notification at issue here. Pre-*Smith* First Amendment Free Exercise cases, which remain instructive in interpreting RFRA, *see Priests for Life*, 772 F.3d at 244, involved much more significant effects on the lives of religious objectors. For example, in *Sherbert*, the plaintiff, a Seventh-day Adventist, was denied unemployment compensation after her employer discharged her because she

28

refused to work on Saturday, her religion's day of rest. 374 U.S. at 399–401.

Similarly, in *Yoder*, the statute at issue required the Old Order Amish plaintiffs to send their children to school until the age of sixteen, in violation of their religion. 406 U.S. at 207–08. In *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 709 (1981), a religious pacifist was denied unemployment benefits after he quit his job following a transfer to a department where he was required to work in the production of armaments. Here, by contrast, Plaintiffs are not denied any similar government benefits, nor are they required to do anything besides identify themselves as religious objectors via a one-page form.

Cases finding a substantial burden under RFRA have similarly involved much more significant burdens on religious objectors. In *Jolly v. Coughlin*, 76 F.3d 468, 476–77 (2d Cir. 1996), this Court found a substantial burden where the challenged regulations required the plaintiff, a Rastafarian prison inmate, to undergo a physically-invasive and religiously-objectionable medical screening – in essence, to suffer an invasion of his bodily integrity. In *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 425–26 (2006), a substantial burden existed where the Controlled Substances Act, 21 U.S.C. § 801 et seq., prevented the religious objector plaintiffs from *ever again* engaging in a

29

sacramental ritual. More recently, in *Hobby Lobby*, the Supreme Court found a substantial burden where the contraceptive coverage mandate, in the absence of *any accommodation*, required for-profit corporations to pay out of pocket for the use of religiously-objectionable contraceptives by thousands of employees or pay significant fines. 134 S. Ct. at 2775–79. And most recently, in *Holt*, a prison policy requiring a Muslim prisoner to cut his beard throughout his period of incarceration was found to substantially burden his religious beliefs. 135 S. Ct. at 862.

The burden imposed on Plaintiffs here stands in contrast to these previous cases. "Accurately understood, the opt-out mechanism imposes on Plaintiffs only the *de minimis* administrative burden associated with completing the self-certification form or the alternative notice." *Priests for Life*, 772 F.3d at 253. Viewed objectively, completing a form stating that one has a religious objection is not a substantial burden. To be sure, the notification required of Plaintiffs here certainly imposes *some* burden. But any imposition from completing the form falls well below the degree of substantial burdensomeness that has historically entitled a RFRA plaintiff (or pre-*Smith* free exercise plaintiff) to accommodation, or triggered strict scrutiny analysis. *See Kaemmerling*, 553 F.3d at 678 (noting that

30

"[a]n inconsequential or *de minimis* burden on religious practice does not rise to [the] level" of a substantial burden).

Indeed, the accommodation here involves the same de minimis burden of notification historically required of religious objectors under statutory and regulatory schemes such as the military draft and medical conscience clauses. *See Little Sisters of the Poor*, 2015 WL 4232096, at *24 n.31 ("Many religious objection schemes require an affirmative opt out before another person is required to step in and assume responsibility . . . ."). As with other religious objectors, there must be some method by which the government can be notified of the objection. Otherwise there is no way that the government can know which organizations it needs to accommodate. Here, the government has provided flexible, largely effortless, and essentially cost-free options for notification. Plaintiffs have provided us with no case law concluding that a similarly minimal administrative notification of religious objection constitutes a substantial burden.

Nevertheless, urging the Court to look beyond the simplicity of the relevant notification forms, Plaintiffs raise two arguments. First, Plaintiffs contend that the burden of notification is substantial because the penalties for non-compliance with the notification requirement are significant. Second,

31

Plaintiffs argue that the consequences of notification – the downstream actions of the government and third parties – transform completion of the relevant forms into a substantial burden. For the reasons discussed below, we do not find either argument persuasive.

**1. Penalties for Non-Compliance**

Plaintiffs first argue that the government imposes a substantial burden whenever it puts a RFRA plaintiff to a choice between (a) taking action she finds religiously objectionable, or (b) suffering substantial penalties. *See Jolly*, 76 F.3d at 477 ("[A] substantial burden exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" (quoting *Thomas*, 450 U.S. at 718) (second alteration in original)). Thus, because Plaintiffs would pay serious fines or be forced to provide their employees contraceptive coverage if they failed to utilize the opt-out mechanism, they claim a substantial burden exists here.

Viewed in the context of our previous discussion, this argument is a non sequitur. An objectively insubstantial burden does not become substantial simply because a RFRA plaintiff faces substantial burdens in the alternative. Because Plaintiffs can comply with the notification requirement without suffering a

substantial burden, it makes no difference that they would incur significant penalties for non-compliance.

For this reason, the cases cited by Plaintiffs are not applicable. As noted previously, in *Jolly* the challenged regulations required a prisoner to suffer a physical invasion of his bodily integrity. *Id.* at 476–77. In finding this invasion a substantial burden, we further observed that the penalty for non-compliance with this procedure was severe – "confinement to medical keeplock." *Id.* at 477. As we recognized, when the challenged action imposes a substantial burden, it is obviously pertinent whether available alternatives also impose a substantial burden. However, this secondary analysis matters only if the challenged conduct is *itself* a substantial burden. Indeed, we emphasized that the severity of the sanction for non-compliance was not the gravamen of the substantial burden analysis. *Id.* ("[T]he district court need not have emphasized the extraordinary length of the plaintiff's confinement to medical keeplock as an indicator of a substantial burden.").

The same logic explains the Supreme Court's statement in *Hobby Lobby* that "[b]ecause the contraceptive mandate forces [plaintiffs] to pay an enormous sum of money – as much as $475 million per year in the case of Hobby Lobby – if they

insist on providing insurance coverage in accordance with their religious beliefs, the mandate clearly imposes a substantial burden on those beliefs." 134 S. Ct. at 2779. Unlike the regulatory scheme at issue here, the regulations challenged in *Hobby Lobby* imposed a substantial burden, requiring the for-profit corporation plaintiffs to pay out of pocket to insure thousands of individuals. *Id.* at 2775–78. Given that the burden of compliance was objectively substantial, the *Hobby Lobby* Court naturally also had to consider whether non-compliance with the challenged regulations might result in only an insubstantial penalty. Because these alternative penalties were *also* significant, the *Hobby Lobby* plaintiffs had no means of avoiding a substantial burden. By contrast, because completing the opt-out forms here imposes no substantial burden on Plaintiffs, the fact that they may arguably incur substantial burdens in the alternative is irrelevant.

Similar issues undermine Plaintiffs' citation to *Thomas*, 450 U.S. at 718. There, as noted, the government denied a religious pacifist unemployment benefits after he quit his job producing armaments. *Id.* at 709. Denial of these potentially life-saving unemployment benefits imposed an objectively substantial burden on the plaintiff's religious exercise. Furthermore, Thomas lacked an alternative option for "not complying" with this loss of benefits. Although he

could have continued to work in violation of his religious beliefs, this would not have avoided the loss of benefits, and, indeed, would have itself imposed a substantial burden. Crucially, the regulatory scheme at issue did not offer the objector an option that was free of a substantial burden.

In the context of the cases cited by Plaintiffs, it was thus pertinent that the cost of non-compliance with the challenged regulation was *also* significant. When doing what the governmental scheme requires is a substantial burden, then a court must also consider whether any alternatives available to the plaintiff also impose a substantial burden. Here, by contrast, what the governmental scheme actually requires of Plaintiffs – the filing of a form or letter of notification – is *not* a substantial burden. The fact that they may arguably incur substantial burdens if instead they unlawfully refuse to comply is therefore irrelevant.

**2. Effects of Compliance**

Plaintiffs further argue that the objectively insubstantial burden of filing either the opt-out form or the letter to HHS is substantial because it renders them complicit in bringing about consequences forbidden by their religion, namely the provision of contraceptive coverage by the government and third parties. Although third parties ultimately bear the burden of providing contraceptive

coverage, Plaintiffs contend that their participation is essential to this coverage. Plaintiffs argue that a substantial burden exists because the submission of the self-certification form or letter "triggers" or "facilitates" the provision of objectionable contraceptive services. Under this view, Plaintiffs' acts of self-certification as religious objectors ultimately result in their third-party administrators providing contraceptive coverage to their employees.

Like the other circuits to have addressed similar RFRA claims, we are not persuaded regarding the mechanics of Plaintiffs' "trigger" argument. As other courts have concluded, a religious objector's submission of the form or letter does not, as a legal matter, trigger or facilitate the provision of contraceptive coverage. *See, e.g., Geneva Coll.*, 778 F.3d at 437; *Priests for Life*, 772 F.3d at 252–53. Rather, contraceptive coverage occurs through operation of federal law. When third parties step in and provide contraceptive coverage after Plaintiffs opt out, they do so not because Plaintiffs have opted out, but rather because federal law requires or incentivizes them to provide such coverage. The accommodation functions not as a "trigger," but rather as a means of identifying and exempting those employers with religious objections. Once Plaintiffs indicate their desire to have no involvement in the provision of contraceptive coverage, the government

36

steps in and acts to ensure contraceptive coverage without any participation by Plaintiffs. Thus, Plaintiffs' decision to opt out is not the cause of the ultimate contraceptive coverage; rather this coverage happens *in spite* of them.

Yet even accepting Plaintiffs' argument that their submission of the notification form or letter indirectly results in the provision of contraceptive coverage to their employees, there is still no substantial burden here. The regulatory obligations imposed on third parties after Plaintiffs opt out do not transform the de minimis act of notification into a substantial burden. Courts have not found a substantial burden where a plaintiff argues that her religious exercise is violated by the government's internal operations or, by extension, its decision to burden third parties, even where the plaintiff plays a precipitating role. "An asserted burden is . . . not an actionable substantial burden when it falls on a third party, not the religious adherent." *Priests for Life*, 772 F.3d at 246.

Most prominently, in *Bowen v. Roy*, 476 U.S. 693, 695–96 (1986), a Native American plaintiff argued that a statute requiring the government to use his daughter's social security number to process his welfare benefit application violated the Free Exercise Clause. Plaintiff Roy believed that the government's assignment of a social security number to his daughter would "'rob the spirit' of

37

his daughter and prevent her from attaining greater spiritual power." *Id.* at 696. The Supreme Court rejected Roy's challenge to the government's internal use of his daughter's social security number, concluding that, rather than complaining about a government restriction on his own conduct, Roy sought to "dictate the conduct of the Government's internal procedures." *Id.* at 700. Roy's claim failed in this respect because, even though assigning his daughter a social security number in processing the benefit application offended his religious sensibilities, it did not "itself in any degree impair Roy's freedom to believe, express, and exercise his religion." *Id.* (internal quotation marks omitted). The Court concluded that although "[t]he Free Exercise Clause affords an individual protection from certain forms of governmental compulsion[,] it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.* The Court declined to "interpret[] the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development." *Id.* at 699 (emphasis in original). Rather, it concluded that the "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id.*; *see also Lyng v.*

*Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51, 452 (1988)

("[G]overnment simply could not operate if it were required to satisfy every citizen's religious needs and desires.").

Similarly, in *Kaemmerling*, the D.C. Circuit concluded that a federal prisoner could not establish a substantial burden under RFRA when he sought to enjoin application of the DNA Analysis Backlog Elimination Act on the basis that DNA sampling, storage, and collection without limitations violated his religious beliefs about the proper use of the "building blocks of life." 553 F.3d at 673–74, 680. The court found that the plaintiff's religious exercise was not substantially burdened, because "[t]he extraction and storage of DNA information are entirely activities of the FBI, in which Kaemmerling plays no role and which occur after the BOP has taken his fluid or tissue sample (to which he does not object)." *Id.* at 679. The D.C. Circuit thus concluded that "[l]ike the parents in *Bowen*," Kaemmerling was attempting "to require the government itself to conduct its affairs in conformance with his religion." *Id.* at 680.

The same principles govern here. As with Roy's completion of the welfare application or Kaemmerling's provision of a tissue sample (to which he did not object), Plaintiffs' act of notification results in downstream conduct they find

39

religiously objectionable. But like Roy and Kaemmerling, whose conduct also indirectly "triggered" government action they found religiously objectionable, Plaintiffs cannot claim a substantial burden on the basis of this subsequent conduct. "Religious objectors do not suffer substantial burdens under RFRA where the only harm to them is that they sincerely feel aggrieved by their inability to prevent what other people would do to fulfill regulatory objectives after they opt out. They have no RFRA right to be free from the unease, or even anguish, of knowing that third parties are legally privileged or obligated to act in ways their religion abhors." *Priests for Life*, 772 F.3d at 246 (citation omitted). The objectively insubstantial burden of filing the notification form or letter does not become a substantial burden because of the subsequent burdens imposed on third parties by the government.

"Just as the Government may not insist that [Plaintiffs] engage in any set form of religious observance, so [Plaintiffs] may not demand that the Government join in their chosen religious practices by refraining from" working with third parties to provide their employees contraceptive coverage. *Bowen*, 476 U.S. at 699–700. While we do not doubt the sincerity or rationality of Plaintiffs' beliefs, their legal argument would have the effect, if accepted, of enabling

religious objectors to impose the constraints of their beliefs on the rest of the Nation. The Supreme Court made clear in *Bowen* that religious objectors do not have this right, because burdens falling on third parties, and not the religious objector, are not actionable.

Furthermore, the fact that the government imposes these separate legal responsibilities on contractual counter-parties of eligible organizations does not create a substantial burden on Plaintiffs' religious exercise. *Cf. United States v. Lee*, 455 U.S. 252, 261 (1982) ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity."). Plaintiffs' relationships with their employees and third-party administrators do not provide them an avenue to dictate these entities' independent interactions with the government, even if Plaintiffs find these actions objectionable. *See Priests for Life*, 772 F.3d at 256 ("RFRA does not entitle Plaintiffs to control their employees' relationships with other entities willing to provide health insurance coverage to which the employees are legally entitled.").[9]

---

[9] In a related vein, Plaintiffs contended at oral argument that the

As other circuits have recognized, Plaintiffs' argument "is analogous to a religious conscientious objector to a military draft claiming that the act of identifying himself as such on his Selective Service card constitutes a substantial burden because that identification would then 'trigger' the draft of a fellow selective service registrant in his place and thereby implicate the objector in facilitating war." *Id.* at 246; *see also Little Sisters of the Poor*, 2015 WL 4232096, at *24 n.33; *Univ. of Notre Dame*, 786 F.3d at 623 (Hamilton, *J.*, concurring). The government's subsequent actions in drafting a replacement soldier surely do not transform the conscientious objector's completion of the opt-out form into a substantial burden, even if the conscientious objector finds these acts deplorable as a matter of faith. So too here, no substantial burden exists simply because the government ultimately works with third-party administrators to ensure the provision of contraceptive coverage once Plaintiffs opt out. Were it otherwise, Plaintiffs and the conscientious objector would enjoy a blanket religious veto

government's offer of reimbursement in excess of costs to church plan third-party administrators could eventually result in the disappearance of third-party administrators who might refuse, at the request of eligible organizations, to provide contraceptive coverage. Yet, the fact that a federal policy incentivizes third parties to operate in a manner Plaintiffs find religiously objectionable is not a cognizable burden under RFRA. Plaintiffs do not enjoy a religious objector veto over the government's interactions with their third-party administrators.

over the government's interactions with others. "Although [a] person may have a religious objection to what the government, or another third party, does with something that the law requires to be provided (whether it be a Social Security number, DNA, or a form that states that the person religiously objects to providing contraceptive coverage), RFRA does not necessarily permit that person to impose a restraint on another's action based on the claim that the action is religiously abhorrent." *Geneva Coll.*, 778 F.3d at 441.

Indeed, accepting Plaintiffs' argument would cast doubt on the government's ability to accommodate religious objectors in other spheres. The simple, non-burdensome act of requesting a religious exemption from a regulatory burden would nevertheless create a substantial burden on a religious objector so long as any resulting independent action by the government is also religiously objectionable. *See Univ. of Notre Dame*, 786 F.3d at 621 (Hamilton, *J.*, concurring) ("From conscientious objector status in the military draft to federal and state tax codes, from compulsory school attendance laws to school lunch menus, from zoning law to employment law and even fish and wildlife rules, our governments at every level have long made room for religious faith by allowing exceptions from generally applicable laws."); *see also Geneva Coll.*, 778 F.3d at 439

43

n.14 (analogizing to exemptions for religious objector employees). "The possibilities are endless, but we doubt Congress, in enacting RFRA, intended for them to be." *E. Tex. Baptist Univ.*, 2015 WL 3852811, at *7.

Plaintiffs may certainly object to this subsequent action by the government and third parties based on their sincere religious beliefs, and we reiterate that we do not doubt the sincerity or rationality of Plaintiffs' beliefs. But just because Plaintiffs feel complicit in these third party actions does not mean that the regulations impose a "burden" on their religious practice, much less a burden that is "substantial" under RFRA. While a plaintiff's "religious views may not accept [the] distinction between individual and governmental conduct," the law does. *Bowen*, 476 U.S. at 701 n.6; *see also Lyng*, 485 U.S. at 451 ("Whatever may be the exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs, the location of the line cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development."). "Accepting the sincerity of Plaintiffs' beliefs . . . does not relieve this Court of its responsibility to evaluate the substantiality of any burden on Plaintiffs' religious exercise, and to

distinguish Plaintiffs' duties from obligations imposed, not on them, but on insurers and TPAs." *Priests for Life*, 772 F.3d at 247.

Thus, consistent with *Bowen* and related cases, we must assess whether the claimed burden falls on a plaintiff or a third party with no religious objection. Here, the only burden that actually falls on Plaintiffs is the objectively insubstantial requirement of completing the opt-out form or letter. When all the government requires of a religious objector is the de minimis requirement of notification for an exemption such that the burden may be shifted to another, there is no substantial burden, even if the religious objector sincerely finds the ultimate actions taken by the government and third parties offensive. Even though Plaintiffs believe their role in the causal chain makes them complicit in the provision of contraceptives, this belief does not control the substantial burden inquiry. Just like the conscientious objector, whose decision to opt out indirectly facilitates the drafting of another, Plaintiffs are not substantially burdened by the ultimate actions of the government and third parties. If what Plaintiffs must do to exempt themselves from the contraceptive coverage mandate is not substantially burdensome, it makes no difference that Plaintiffs' act of claiming exemption plays a functional role in the government's achievement of the purposes to which

Plaintiffs object, or that they believe themselves to be substantially burdened for that reason.

*    *    *

The burden that the accommodation places on Plaintiffs is merely one of notification, equivalent to the burden historically placed on draft registrants to indicate their conscientious objections to military service. Once Plaintiffs avail themselves of the simple, non-burdensome means of opting out, the regulations do not require them to play any role in the provision of contraceptive coverage or to suffer punishments for not doing so. To the contrary, the accommodation relieves them of providing contraceptive coverage, and instead enlists third-party administrators to provide such coverage. If a regulatory scheme that might otherwise violate an objecting individual's rights under RFRA allows the objector to exempt himself from compliance via a simple, non-burdensome act of notification, there is no substantial burden. Furthermore, subsequent regulation of non-objecting parties in a manner that an objecting party finds offensive does not transform the act of opting out into a cognizable substantial burden. The rights conferred by the First Amendment and RFRA do not include a right to

46

have the government or third parties behave in a manner that comports with an individual's religious beliefs.

**CONCLUSION**

For the foregoing reasons, we reject Plaintiffs' RFRA challenge to the contraceptive coverage mandate. The regulations at issue do not substantially burden Plaintiffs' religious exercise in violation of RFRA. Accordingly, the judgment of the district court is reversed in relevant part.